UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PENN-STAR INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ZENITH INSURANCE COMPANY, DM CAMP & SONS, a general partnership, GOLDEN LABOR SERVICES, LLC, and VALENTIN ROMER COLOTL,<br><br>Defendants. | No. 1:18-cv-01319-DAD-EPG<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. No. 32) |

This matter is before the court on plaintiff Penn-Star Insurance Company's ("Penn-Star") motion for summary judgment. (Doc. No. 32.[1]) A hearing on the motion was held on April 16, 2019. Attorney James Nielsen appeared on behalf of Penn-Star, attorney James Wilkins appeared on behalf of defendant Golden Labor Services, LLC ("Golden Labor"), and attorney Karen Uno appeared telephonically on behalf of defendants Zenith Insurance Company ("Zenith") and DM

---

[1] On March 5, 2019, Penn-Star filed a motion for summary judgment. (Doc. No. 30.) On March 18, 2019, Penn-Star filed an amended motion for summary judgment. (Doc. No. 32.) Accordingly, the court will deny Penn-Star's earlier filed motion for summary judgment as having been rendered moot by the later filed motion. However, the court will consider the attachments to the original motion (*see* Doc. Nos. 30-2, 30-3) to the extent that they have not been amended by the later motion or otherwise opposed by defendants, since the amended motion for summary judgment relies on those attachments.

1

Camp & Sons ("DM Camp"). Having considered the parties' briefs and oral arguments, and for the reasons set forth below, the court will deny Penn-Star's motion for summary judgment.

**BACKGROUND**

Penn-Star seeks a declaration from this court that, as a matter of law, the damages sought against defendants Golden Labor, DM Camp, and Valentin Romer Colotl[2] ("Colotl") in an underlying state court action are not covered under the insurance policy that it issued Golden Labor (the "Penn-Star policy"), and that it therefore has no duty to defend or indemnify these defendants in the underlying state court action.[3] (Doc. No. 32 at 5.) The material facts of this case are undisputed[4] and, as relevant to the pending motion, are set forth below.

---

[2] Defendant Colotl has not appeared in this action. On March 1, 2019, the Clerk of the Court entered default against him. Penn-Star's pending motion for default judgment against defendant Colotl (Doc. No. 26) will be addressed separately by the undersigned in considering the findings and recommendations issued by the assigned magistrate judge. *See* Local Rule 302(c)(19).

[3] Penn-Star also seeks a declaration stating that defendant Zenith, who issued a separate insurance policy to DM Camp (the "Zenith policy"), has a duty to defend and indemnify Golden Labor, DM Camp, and Colotl in the underlying action pursuant to that policy. (*See* Doc. No. 13.) If the court finds that both Penn-Star and Zenith are obligated to defend and indemnify in the underlying action, then Penn-Star seeks a declaration stating that Zenith's coverage is primary. (*Id.*) Making either of these determinations would require the court to interpret both insurance policies. However, the pending motion only addresses whether the Penn-Star policy's auto exclusion precludes coverage. While a section of the pending motion is entitled "Zenith owes a duty to defend Golden Labor and Colotl in the [underlying] action" (Doc. No. 32 at 2), Penn-Star only provides a conclusory analysis of this issue. Moreover, at the April 16, 2019 hearing on the pending motion, counsel for Golden Labor noted that "whatever interplay [that] may . . . exist between [the policies] is something that . . . is probably not appropriate for summary adjudication," and counsel for Penn-Star noted that "the court can decide the issue of the scope of Penn-Star's coverage without addressing the scope of Zenith's coverage." Accordingly, the court confines this order to the question of whether the Penn-Star policy covers the underlying action.

[4] The parties have submitted a joint statement of undisputed facts. (*See* Doc. No. 34 (joint statement of undisputed facts, hereinafter "JSUF").) Most of the facts recited in this order are gleaned from that filing. Defendant Golden Labor has also filed a separate statement of undisputed facts. (Doc. No. 36-1.) Moreover, each of the parties has filed declarations (*see* Doc. Nos. 30-2, 34-1, 36-2, 37-1, 38-1), and some have attached to those declarations various documents, including the insurance policies at issue, the complaint filed in the underlying action, various correspondences between the parties, and other documents (*see, e.g.*, Doc. Nos. 30-1, 34-1, 37-1, 38-1). To the extent there are no objections, the court construes the facts contained within these filings to be undisputed for the purpose of resolving the pending motion. Where an objection has been raised, the court will only address the objection by way of footnote if it relies on that evidence in resolving the pending motion.

**A.     The Parties**

Penn-Star is an insurance company that issued a commercial general liability ("CGL") insurance policy to Golden Labor. (JSUF at ¶ 8.) Golden Labor is a labor-services firm that provides farms with laborers. (*Id.* at ¶ 5.) DM Camp is a farm based in Kern County. (*Id.* at ¶ 3.) Colotl is a farm contractor. (*Id.* at ¶ 5.) DM Camp hired Colotl through Golden Labor. (*Id.*) Zenith is an insurance company that issued an "agribusiness insurance package policy" to DM Camp (the "Zenith policy"). (*Id.* at ¶ 16.)

**B.     The Underlying State Court Action**

On June 27, 2018, the plaintiffs in the state court action filed a complaint in Kern County Superior Court, naming Golden Labor, DM Camp, and Colotl as the defendants (the "underlying action" or "state court action"). (*Id.* at ¶ 1.) The underlying action stems from a collision between an automobile and a tractor pulling a tillage disc in unincorporated Kern County. (*Id.* at ¶¶ 2–3.) The automobile in the collision was owned by one plaintiff in the state court action and was driven by another. (*Id.* at ¶ 2.) The driver of the automobile was killed in the collision and the three surviving passengers suffered injuries. (*Id.* at ¶ 2.)

The state court complaint alleges that, at the time of the collision, Colotl was operating the tractor that collided with the automobile and that the tractor was owned and entrusted to him by DM Camp and Golden Labor. (*Id.* at ¶¶ 3, 4.) Based thereon, the underlying complaint alleges that Colotl, DM Camp, and Golden Labor were negligent and careless in their ownership, operation, maintenance, and/or control of the tractor, and that their negligence and carelessness caused the tractor to collide with the automobile, thereby causing the decedent's death and the other injuries about which they complain. (*Id.* at ¶ 3.) The underlying complaint further alleges that the negligence of these defendants' is not limited to the ownership, operation, maintenance, and/or control of the tractor but also includes the negligent hiring, retaining, training, and/or supervision of persons responsible for the collision. (*Id.*)

Golden Labor and Colotl tendered the underlying action to Penn-Star for a defense and indemnification under the Penn-Star policy. (*Id.* at ¶ 22.) Penn-Star accepted the tender subject to a reservation of its rights, advising Golden Labor and Colotl that it agreed to provide them with

a defense in the underlying action subject to the terms, conditions, limitations, and exclusions of the Penn-Star policy.[5] (*Id.* at ¶¶ 22–23.)

**C.     The Penn-Star Insurance Policy**

Penn-Star issued the CGL Penn-Star policy (insurance policy number CPV0014424) to Golden Labor for the period of February 19, 2017 to February 19, 2018. (JSUF at ¶ 8.) As relevant to the pending motion, "**SECTION 1 – COVERAGES**," "**COVERAGE A**" of the Penn-Star policy states:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

(Doc. No. 34-1 at 19.)

Like most insurance policies, the Penn-Star policy at issue here contains a set of exclusions to which "th[e] insurance does not apply to." (*Id.* at 20.) Appearing under paragraph "**2. Exclusions**" to Coverage A, the "**g. Aircraft, Auto, Or Watercraft**" exclusion states that the policy does not apply to:

> "Bodily injury" or "property damage" arising out of the ownership, maintenance, use, or entrustment to others of any aircraft, "auto," or watercraft owned or operated by or rented or loaned to any insured . . .. This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto," or watercraft that is owned or operated by or rented or loaned to any insured.

---

[5] Even though the Penn-Star policy was issued only to defendant Golden Labor, plaintiff Penn-Star seeks a declaration that it owes no duty to defend or indemnify any of the defendants in this action, including defendants DM Camp and Colotl. This is because it is undisputed that if the Penn-Star policy covers defendant Golden Labor with respect to the underlying action, then defendant DM Camp qualifies as an "additional insured" under the policy. (JSUF at ¶ 10.) Moreover, it appears that defendant Colotl would also be covered under the Penn-Star policy, since Penn-Star accepted his tender of the underlying action, despite him not being a named insured, and the Penn-Star policy contains a "Section II – Who Is An Insured," which provides that the insured's "employees" are also covered, with the policy defining "employee" to includes leased or temporary workers. (*Id.* at ¶¶ 22, 33, 34.)

4

(*Id.* at 22; JSUF at ¶ 11.)  This standard auto exclusion, however, is amended and replaced by an endorsement titled "**AUTO EXCLUSION**."  (JSUF at ¶ 12.)  That endorsement states:

> **THIS ENDORSEMENT CHANGES THE POLICY**
>
> The endorsement modifies insurance provided under the []:
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
>
> **Exclusion 2. of SECTION 1 – COVERAGES – COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY – Aircraft, Auto, Or Watercraft** is deleted in its entirety and replaced with the following:
>
> This insurance does not apply to:
> "Bodily injury" or "property damage" arising out of the ownership, maintenance, or use by any person or entrustment to others, of any aircraft, "auto," or watercraft.
>
> This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved an aircraft, "auto," or watercraft. . . .

(Doc. No. 34-1 at 37; JSUF at ¶ 13.)

Thus, while exclusion "**g. Aircraft, Auto, Or Watercraft**" excludes coverage for bodily injury or property damage arising out of the ownership, maintenance, use, or entrustment to others of any "auto" owned or operated by or rented or loaned to any *insured*, the auto exclusion endorsement replaced that language.  The endorsement excludes coverage for bodily injury or property damage arising out of the ownership, maintenance, or use by *any person* or entrustment to others of any "auto."

In a separate section, entitled "**SECTION V – DEFINITIONS**," the Penn-Star policy provides definitions for terms used in it.  (Doc. No. 34-1 at 31.)  There, "auto" is defined as:

> a. A land motor vehicle, trailer, or semitrailer designed for travel on public roads, including any attached machinery or equipment; or
>
> b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle law where it is licensed or principally garaged.
>
> However, "auto" does not include "mobile equipment."

(Doc. No. 34-1 at 31; JSUF at ¶ 14.)

5

Finally, the policy defines "mobile equipment" to include:

> a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads. . . .
>
> However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos."

(Doc. No. 34-1 at 32; JSUF at ¶ 15.)

**D.      This Action and the Pending Motion for Summary Judgment**

On September 25, 2018, Penn-Star commenced this declaratory judgment action (Doc. No. 1) and on March 7, 2019, filed the pending motion for summary judgment, contending that the policy's auto exclusion, as amended by endorsement, excludes coverage. (Doc. No. 32.) On April 2, 2019, Golden Labor, Zenith, and DM Camp filed their oppositions to Penn-Star's motion for summary judgment.[6] (Doc. Nos. 36, 37.) On April 9, 2019, Penn-Star filed its reply. (Doc. No. 38.)

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[6] Included in defendants Zenith and DM Camp's opposition to the pending motion is a purported "cross-motion for summary judgment." (*See* Doc. No. 37 at 1, 25–26.) Therein, these defendants seek an order from the court declaring that: (1) Penn-Star owes a duty to defend Golden Labor, DM Camp, and Colotol in the underlying state court action; and (2) Zenith does not owe a duty to defend Golden Labor in that action. (*Id.* at 25.) Although the first of these requests overlaps to some extent with the issues raised in the pending motion for summary judgment, the court will not consider this purported cross-motion, since defendants Zenith and DM Camp did not notice it for hearing before the undersigned as required, nor did they file a proper motion supported by evidence, accompanying briefs and a statement of undisputed facts. *See* Local Rules 230(b), 260(a). To bury a cross-motion for summary judgment in an opposition to another party's motion for summary judgment is inherently unfair and inappropriate. That is particularly true here where there are defendants with interests adverse to one another. Indeed, at the April 16, 2019 hearing on the pending motion, counsel for defendant Golden Labor expressed that it was unable to file an opposition to defendants Zenith and DM Camp's cross-motion because it was not properly noticed. Accordingly, the court will not consider Zenith and DM Camp's "cross-motion for summary judgment."

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Undisputed facts are taken as true for purposes of a motion for summary judgment. *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 745 (9th Cir. 2010). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . .. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**ANALYSIS**

It is undisputed that, but for the application of the Penn-Star policy's auto exclusion, as amended by the endorsement, Penn Star has a duty to defend and indemnify Golden Labor in the underlying action pursuant to that policy. (*See* Doc. Nos. 32, 36, 37, 38.) Penn-Star advances two theories in support of its position that, as a matter of law, it owes no duty to defend Golden Labor, DM Camp, or Colotl in the underlying state court action. First, Penn-Start contends that the auto exclusion, as amended by endorsement, excludes coverage because the tractor involved in the collision is subject to financial responsibility laws and is therefore an excludable "auto" under the Penn-Star policy. (Doc. No. 32 at 19 –22.) Second, it contends that coverage is additionally excluded under the auto exclusion of the Penn-Star policy, as amended by endorsement, because the automobile involved in the collision is an "auto" used by "any person." (*Id.* at 15–19.)

"It is . . . a familiar principle that a liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993), *as modified on denial of reh'g* (May 13, 1993). "[T]he [insurer] must defend a suit which *potentially* seeks damages within the coverage of the policy." *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 (1966). "The determination [of] whether the insurer owes a

duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." *Horace Mann*, 4 Cal. 4th at 1081. In analyzing the policy, "courts must consider both the [] language in the policy, and the endorsements or exclusions affecting coverage, if any, included in the policy terms." *Modern Dev. Co. v. Navigators Ins. Co.*, 111 Cal. App. 4th 932, 939 (2003), *as modified* (Aug. 29, 2003), *as further modified* (Sept. 18, 2003). "Facts known to the insurer and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy." *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 296 (1993).

To prevail in an action for declaratory relief regarding the duty to defend, "the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*." *Id.* at 300; *see also Reg'l Steel Corp. v. Liberty Surplus Ins. Corp.*, 226 Cal. App. 4th 1377, 1389 (2014) ("The insurer's defense duty is obviated where the facts are undisputed and conclusively eliminate the potential the policy provides coverage for the third party's claim.") "Facts merely tending to show that the claim is not covered or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage . . . add no weight to the scales." *Montrose Chem.*, 6 Cal. 4th at 300. Accordingly, for Golden Labor, DM Camp, and Colotl to survive Penn-Star's motion for summary judgment here, they must show that the underlying claims may fall within the Penn-Star policy; Penn-Star, on the other hand, must prove that they cannot. *See Montrose Chem.*, 6 Cal. 4th at 300. Penn-Star "is entitled to summary judgment that no potential for indemnity exists if the evidence establishes no coverage under the policy as a matter of law." *Reg'l Steel*, 226 Cal. App. 4th at 1389; *see also Am. Star Ins. Co. v. Ins. Co. of the W.*, 232 Cal. App. 3d 1320, 1325 (1991) ("If the claim does not fall within the insuring clauses, there is no need to analyze further. There is no coverage.") (citations omitted).

Defendants have met their initial burden of establishing that the claims in the underlying action are within the scope of the Penn-Star policy's insuring clause because it is undisputed that the plaintiffs in the state court action seek damages for bodily injury caused by an occurrence. (*See* Doc. Nos. 32, 36, 37, 38); *see also Montrose Chem.*, 6 Cal. 4th at 300. Accordingly, below

the court addresses whether the Penn-Star policy's auto exclusion removes the underlying action from the scope of that policy's insuring clause.

**A.      Whether the Penn-Star Policy's Auto Exclusion as Amended by Endorsement Excludes Coverage Because the Accident Involved a Tractor**

Penn-Star contends that its auto exclusion, as amended by endorsement, excludes the damages for bodily injury sought by the plaintiffs in the underlying state court action because the tractor at issue qualifies as an "auto." (Doc. No. 32 at 19.) Its argument is as follows. The auto exclusion, as amended by endorsement, states that the Penn-Star policy does not apply to bodily injury "arising out of the ownership, maintenance, or use by any person or entrustment to others, of any . . . 'auto.'" (Doc. No. 30-1 at 62.) Despite the policy defining an "auto" to not include "mobile equipment" (*id.* at 56), and despite the policy defining "mobile equipment" to include "farm equipment" (*id.* at 58), Penn-Star argues that "mobile equipment" does not include "any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged" (*id.*). Penn-Star contends that, because the tractor at issue is subject to California's financial responsibility laws, it qualifies as an "auto" when applying the definitions of "mobile equipment" and "auto" provided in the Penn-Star policy and is therefore excluded pursuant to the auto exclusion. (Doc. No. 32 at 19.) Golden Labor counters that this interpretation of the Penn-Star policy's provisions is unreasonable and that the limitation resulting from the definition of "mobile equipment" with respect to whether a land vehicle is subject to "compulsory or financial responsibility laws" is not plain or clear. (Doc. No. 36 at 16–22.) Zenith and DM Camp also contend that this limitation is not plain or clear, arguing further that the limitation is also not conspicuous and that the exclusion itself is ambiguous. (Doc. No. 37 at 11–16.)

"In the insurance context, we begin with the fundamental principle that an insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. . . . [A]ny exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." *Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1204 (2004) (citation and internal quotation marks omitted). "Coverage may be limited by a valid

10

endorsement and, if a conflict exists between the main body of the policy and an endorsement, the endorsement prevails." *Id.* However, in order to be enforceable, "any provision that takes away or limits coverage reasonably expected by an insured must be 'conspicuous, plain and clear.'" *Id.* Therefore, "any such limitation must be placed and printed so that it will attract the reader's attention. Such a provision also must be stated precisely and understandably, in words that are part of the working vocabulary of the average layperson." *Id.* "The burden of making coverage exceptions and limitations conspicuous, plain and clear rests with the insurer." *Id.* Applying these well-recognized principles here, the court concludes that Penn-Star cannot, as a matter of law, rely on the provisions limiting coverage for "mobile equipment" in the Penn-Star policy to escape its coverage obligations in this case.

*First*, the provisions are not conspicuous. In order to reach the conclusion that the tractor at issue is not covered by the Penn-Star policy because it is a "mobile equipment" subject to financial responsibility laws, the reader of the insurance policy must locate several provisions in a policy that is almost fifty pages long. Initially, the reader must find the auto exclusion, as amended by endorsement, which states that the insurance policy does not apply to bodily injury arising out of the use of any "auto." Next, the reader must find the definition of "auto," which explicitly excludes "mobile equipment." Thereafter, one would have to locate the definition of "mobile equipment," which explicitly notes that "farm machinery" and "other vehicles designed principally for use off public roads" qualify as "mobile equipment." At this point, the average insured might reasonably assume that a tractor constitutes farm machinery or an "other vehicle designed principally for use off public roads" and is therefore not within the scope of the auto exclusion. *See Jauregui v. Mid-Century Ins. Co.*, 1 Cal. App. 4th 1544, 1552 (1991) ("Protection of the insured's reasonable expectation of coverage underlies the rules of construction dictating that we construe exclusionary language against the insurer . . . and demands . . . conspicuous placement to avoid or limit coverage.") "Without further notice, [the] average insured could scarcely anticipate a subparagraph . . . [that] would contain an exclusion." *Id.* at 1549 (citation and internal quotation marks omitted). Yet, this is exactly what the definition of "mobile equipment" contains, as it goes on to exclude from its scope "any land vehicles that are subject to

11

a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged." Here, this exclusion is not conspicuous since it is buried in the definitions section of the policy. *See Thompson v. Mercury Cas. Co.*, 84 Cal. App. 4th 90, 95 (2000) ("A limitation is conspicuous when it is positioned and printed in a form which adequately attracts the reader's attention to the limitation.") (internal quotation marks and citation omitted); *see also Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1209 (2004) ("We agree with the Court of Appeal that burying the . . . limitation among [other] provisions renders it inconspicuous and potentially confusing to the average lay reader.") Moreover, the auto exclusion, as amended by the endorsement, does not even alert the policyholder that its scope will or could be expanded by a definition that appears in a different section of the policy and not in the endorsement itself. *See Haynes*, 32 Cal. 4th at 1205 (finding limiting language to be inconspicuous where it appeared on the policy's tenth page as the second of four paragraphs and "[t]here [wa]s nothing in the [definition] to alert a reader that it limits . . . coverage, nor anything in the section to attract a reader's attention to the limiting language"). In short, "the average lay reader . . . would have a difficult time locating the limiting language and is not required to conduct such an arduous search for camouflaged exclusions." *Jauregui*, 1 Cal. App. 4th at 1550. Accordingly, the court concludes that Penn-Star has not "[met] its stringent obligation to alert a policyholder to limitations on anticipated coverage by hiding the disfavored language in an inconspicuous portion of the policy." *Id.*

*Second*, even if the reader successfully found all of the relevant provisions, the undersigned concludes that the provisions limiting coverage for "mobile equipment" in the Penn-Star policy are not plain or clear. *See id.* ("Conspicuous placement of exclusionary language is only one of two rigid drafting rules required of insurers to exclude or limit coverage. The language itself must be plain and clear."). In order to establish that a provision is plain and clear, "[u]nderstandability is [] required" and "the exclusion must be couched in words which are part of the working vocabulary of average lay persons." *Id.* (internal quotation marks and citation omitted). Here, the provision limiting coverage is the language that appears in the definition of "mobile equipment," which states that "any land vehicles that are subject to a compulsory or

12

financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged" are not considered "mobile equipment." Zenith, Golden Labor, and DM Camp contend that an average lay person would not understand the scope of this exclusion as it is now interpreted by Penn-Star. (Doc. Nos. 36 at 20; 37 at 11.) The court agrees.

"Although 'Financial Responsibility Law' may be an obvious reference to the Vehicle Code to lawyers and judges, . . . it is too vague to meet the stringent obligation of the insurer to limit coverage in plain and clear language." *Jauregui*, 1 Cal. App. 4th at 1551. Here, in order for Golden Labor to understand the coverage provided to it, it "was expected to either know the financial responsibility law . . . or know the discrete body of statutory law [] set forth within . . . the [California] Vehicle Code." *Id.* at 1552. The Penn-Star policy, however, does not reference the statutes embodying California's financial responsibility laws, leaving the reader to determine what is meant by that language. Moreover, as demonstrated by Penn-Star's own motion, even if a reader understood what was meant by that language, in order to reach the conclusion that the tractor at issue is subject to financial responsibility laws, one would need to: (1) locate the definition of "motor vehicle" within California Vehicle Code § 412; (2) conclude that the tractor qualifies as a motor vehicle; and (3) determine whether the tractor, as a motor vehicle, was required to "establish financial responsibility" pursuant to California Vehicle Code §§ 16020 and 16021. (*See* Doc. No. 32 at 20–21.) Assuming that a reader concluded that a tractor did not qualify as a "motor vehicle" under § 412, one would apparently still need to determine whether the tractor qualifies as an "implement of husbandry" as defined in §§ 36000 and 36015 or a "commercial vehicle" as defined in § 260, both of which purportedly require the vehicle at issue to be registered or comply with financial responsibility law. (*See id.* at 21.)

The court need not determine whether the tractor at issue qualifies as a "motor vehicle" or an "implement of husbandry" under the California Vehicle Code because Penn-Star "presumed a level of sophistication and knowledge beyond that of an ordinary layperson and, therefore, the policy provision purporting to limit coverage d[o] not satisfy the requisite plain and clear criteria." *Jauregui*, 1 Cal. App. 4th at 1552. That the ordinary lay insured would not reach the same conclusion as the one proffered by Penn-Star here is bolstered by the analysis of a claims

13

consultant that Penn-Star retained to analyze whether the tractor at issue is subject to a compulsory or financial responsibility law or other motor vehicle insurance law. That claims consultant, after reviewing the relevant sections of the California Vehicle Code, noted in an email to Penn-Star's counsel that a tractor "is not a 'commercial vehicle' which would be required to maintain proof of financial responsibility" and that, "[w]hen read in its entirety, [section] 16500.5 does not appear to support the assertion that the D.M. Camp tractor would be subject to compulsory financial responsibilities law." (Doc. No. 37-1 at 12; *see also* JSUF at ¶ 31.) The claims consultant further noted that, "[w]hile we agree with Penn-Star's position that the D.M. Camp tractor is an implement of husbandry, we disagree that it is subject to compulsory financial responsibilities laws thus making the tractor an 'auto' under the insured's policy for purposes of applying the automobile exclusion." (Doc. No. 37-1 at 12.) Moreover, the claims consultant noted that "implements of husbandry, like the D.M. Camp tractor, are exempt for vehicle registration and therefore are also exempt from maintaining proof of financial responsibility." (*Id.* at 13.) Finally, the claims consultant noted that "it appears the other sections of the California motor vehicle code support the position that the D.M. Camp tractor is not subject to the state's compulsory financial responsibilities laws." (*Id.*)

Because the court finds, based upon the evidence before it on summary judgment, that the provisions limiting coverage for "mobile equipment" in the Penn-Star policy are not conspicuous, plain, or clear as a matter of law, the court concludes that these provisions are unenforceable. *See Hall v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 08 CV 1195 JLS (WVG), 2010 WL 2650271, at *9 (S.D. Cal. July 1, 2010) (finding that "the limitation provision . . . [wa]s not clear, plain and conspicuous and [wa]s therefore unenforceable"); *Thompson v. Mercury Cas. Co.*, 84 Cal. App. 4th 90, 97 (2000) (finding that a limitation appearing in a policy addendum, instead of "in the 'Liability' section of the policy, where an average layperson would expect to find it," was unenforceable). Consequently, Penn-Star cannot rely on these provisions to establish that it is not obligated to defend or indemnify Golden Labor, DM Camp, or Colotl in the underlying state court action.

/////

1    **B.    Whether the Penn-Star Policy's Auto Exclusion as Amended by Endorsement**
2          **Excludes Coverage Because the Collision Involved a Private Automobile**

Penn-Star next contends that, because the collision giving rise to the plaintiffs' injuries in the underlying state court action involved a vehicle, the auto exclusion, as amended by endorsement, excludes coverage. (Doc. No. 32 at 15.) In so arguing, Penn-Star relies on the following language in the auto exclusion: "This insurance does not apply to: 'Bodily injury' or 'property damage' arising out of the ownership, maintenance, or use *by any person* . . . of *any* . . . '*auto*.'" (Doc. No. 30-1 at 62) (emphasis added). Penn-Star's argument is that, because the collision involved *an* automobile that was used by *a* person, the exclusion applies, and it therefore has no obligation to defend or indemnify Golden Labor, DM Camp, or Colotl in the underlying action. Golden Labor argues that Penn-Star's interpretation of this exclusion is unreasonable and does not comport with how exclusions in insurance contracts are generally interpreted. (Doc. No. 36 at 23–30.) Zenith and DM Camp contend that Penn-Star's interpretation is "illogical and overbroad." (Doc. No. 37 at 17–23.) Each defendant contends that the exclusion should not be read so broadly as to exclude liability for accidents involving the use of an "auto" by *any* person and, instead, should reasonably be interpreted to exclude liability for accidents involving the use of an "auto" by a person for whom Golden Labor could be held legally liable.

As discussed, "the California Supreme Court [has] held that insurance contract provisions limiting coverage that are not . . . plain and clear cannot defeat an insured's reasonable expectation of coverage as provided by the insuring clause." *Essex Ins. Co. v. City of Bakersfield*, 154 Cal. App. 4th 696, 707 (2007), *as modified* (Aug. 27, 2007). Here, the undisputed evidence before the court on summary judgment establishes that (1) the auto exclusion is not plain or clear and (2) Golden Labor reasonably expected that the Penn-Star CGL policy would provide it coverage for a lawsuit alleging that it was negligent and careless in its ownership, operation, maintenance, and/or control of the tractor, or negligent with respect to its hiring, retaining, training, and/or supervision of persons responsible for the collision.

*First*, in the insurance context, "basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted

narrowly against the insurer." *Minkler v. Safeco Ins. Co. of Am.*, 49 Cal. 4th 315, 322, *opinion after certified question answered sub nom. Minkler v. Safeco Ins. Co.*, 399 F. App'x 230 (9th Cir. 2010). In addition, "some commentators have argued that an exclusion limits or takes back some of the insurance coverage granted by the insuring clause" because "exclusions serve to limit coverage granted by an insuring clause and [] apply only to hazards *covered* by the insuring clause." *Essex*, 154 Cal. App. 4th at 709 (internal quotation marks and citation omitted). Here, the Penn-Star policy's insuring clause states that: "We will pay those sums that *the insured becomes legally obligated to pay . . ..*" (Doc. No. 34-1 at 19) (emphasis added). In other words, the Penn-Star policy does *not* cover situations where Golden Labor is not liable. However, Penn-Star's proffered interpretation of the auto exclusion seeks to exclude the underlying action from coverage because the state court plaintiffs—who are *not* associated with, employed by, or otherwise connected to Golden Labor—were travelling in an "auto." This interpretation of the auto exclusion runs afoul of the contract interpretation principles outlined by the California Court of Appeal in *Essex*, since Golden Labor does not face exposure to liability in the underlying state court action due to its operation or use of the vehicle involved in the collision. Indeed, the state court complaint does not even seek damages based on the use or operation of the vehicle involved in the collision.

*Second*, in the court's view Penn-Star's "interpretation of the auto exclusion[] converts th[at] exclusion[] into unusual and unfair limitations of coverage that defeat the insured's reasonable expectations of coverage." *Essex*, 154 Cal. App. 4th at 706. Penn-Star interprets the auto exclusion to limit coverage in any case where an automobile was used by any person that resulted in bodily injury, but "no average lay person would have understood the auto exclusion[] in that manner." *Id.* at 707. Here, the defendants in the underlying action are being sued for negligence in the use, maintenance, and operation of the tractor and the negligent training for the use, maintenance, and operation of the tractor. Penn-Star contends that it would provide coverage but can't because the collision involved a vehicle that has no connection to its insured, Golden Labor. Indeed, at the April 16, 2019 hearing on the pending motion, counsel for Penn-Star noted that, had the state court plaintiffs been riding a horse at the time of the collision, Golden Labor

16

would be covered pursuant to the Penn-Star policy. Penn-Star's position in this regard strains credulity. How could Golden Labor have reasonably expected that the Penn-Star policy would protect it from liability for negligently using, operating, or training another to use a tractor in all instances "*except* where the [negligence] leads to an automobile accident involving [a] vehicle[] that had no connection to the [insured]"? *Id.* at 708. Moreover, in this regard Penn-Star's

> interpretation of the auto exclusion[] do[es] not comport with the common understanding of auto exclusions in CGL policies. A CGL policy is intended to cover every risk that is not excluded. A CGL policy has a very broad insuring clause but also has numerous exclusions. Exclusions can be divided into two categories: Certain exclusions are designed to avoid coverage for risks the insurer does not wish to insure at all; e.g., war, flood, intentional injury, environmental pollution, etc. Other exclusions are designed to limit coverage for risks *normally covered by other insurance.* The auto exclusion . . . is an exclusion designed to limit coverage for risks normally covered by other insurance. To cover these risks, the insured must purchase separate insurance.

*Id.* at 709–10. However, "[g]iven that [the insured] could not get separate automobile insurance for the accident in the [underlying] lawsuit, the auto exclusion[] should not be interpreted to deny [it] coverage[.]" *Id.* at 710.

*Third*, Ramiro Marin Perez, who holds Golden Labor's contractor license, avers[7] that, after learning of the facts and circumstances giving rise to the collision, Golden Labor "understood and expected that liability coverage would be available for its potential exposure under [the Penn-Star policy]" and that, at no time prior to the collision, did Penn-Star advise or alert Golden Labor "to any provision or language in the Penn Star policy [which would] . . .

---

[7] Penn-Star objects to this declaration, contending that Golden Labor's intent is irrelevant, and that Mr. Perez's averments constitute hearsay and are argumentative because "[t]he Penn-Star policy has been entered into the record and it speaks to notice of its terms." (Doc. No. 38-2 at 2.) The court overrules Penn-Star's boilerplate objections. First, the objected-to portion of the declaration is not hearsay. Second, the court is not sure what Penn-Star hopes to accomplish by asserting that the objected-to portion of the declaration is "argumentative." Finally, where, as here, an argument is made that language in an insurance contract is not plain or clear, courts are to "interpret [insurance contracts] to protect the objectively reasonable expectations of the insured." *Minkler*, 49 Cal. 4th at 321. This necessarily requires ascertaining what the insured's reasonable expectations were. *See Essex*, 154 Cal. App. 4th at 708 ("Of course, the auto exclusions can be interpreted as Essex has done so, but that is an interpretation of the exclusions in the abstract, and not in the context of the policy or in the circumstances of this case.").

limit[] . . . coverage simply because the claimed injuries involved a vehicle in some way, even if Golden Labor . . . had no connection with or relationship with the driver of the involved vehicle, and/or it was not alleged that Golden Labor . . . was even liable for the use or operation of such vehicle." (Doc. No. 36-2 at 2.) The court in *Essex*, which considered broad auto exclusions similar to the one before this court, found that the "auto exclusions do not plainly and clearly preclude coverage of the [underlying] lawsuit in context of the policy as a whole and in the circumstances of the case," particularly because "the record provide[d] no evidence that [the insurer's] broad interpretation of the auto exclusions was brought to the attention of the insureds[.]" 154 Cal. App. 4th at 706–07. Based on the undisputed evidence presented on summary judgment before this court, that analysis holds true here as well.

*Finally*, the court notes that although Penn-Star has moved for summary judgment in its favor, it has provided no authority in support of its strained interpretation of the phrase "by any person" which appears in its policy's auto exclusion. Penn-Star relies heavily on the decision in *Maxum Indemnity Company v. Kaur*, 356 F. Supp. 3d 987 (E.D. Cal. 2018) in advancing its interpretation of that language, but *Maxum* is both distinguishable and not binding authority. In *Maxum*, the district court granted summary judgment in favor of an insurance company seeking a declaration that it had no duty to defend or indemnify in a state court action asserting causes of action for negligence and negligent training. *Id.* at 1005, 991. At issue there was an automobile exclusion which stated that the "insurance does not apply to . . . '[b]odily injury'. . . arising out of the ownership . . . [or] use . . . of *any* . . . '*auto*' . . . including the supervision, hiring, employment, training or monitoring of . . . anyone in connection with the ownership . . . [or] use . . . of *any* . . . '*auto*.'" *Id.* at 991 (emphasis added). In that case, the insured operated a truck driving school and a driver that the insured had trained was later involved in a single-vehicle, tractor-trailer accident. *Id.* at 990–91. The insurance company argued that it had no obligation to defend or indemnify the insured in an underlying action because the auto exclusion in its policy specifically excluded liability for bodily injury arising out of the training of anyone in connection with the use of any auto. *Id.* at 997. The insured argued that the auto exclusion was ambiguous "and that no average lay person would have understood an auto exclusion to exclude coverage for

18

an allegation of negligent training of the trucking school's specialty students." *Id.* The district court in *Maxum* disagreed, concluding that "the language [before it] plainly and explicitly excluded coverage" for bodily injury arising out of the use of any auto, including the training of anyone in connection with the use of any auto. *Id.* at 1005.

The circumstances in *Maxum* are distinguishable from those presented here. *First*, the underlying state court action in *Maxum* sought damages relating to the driving school instructor's *training* of the driver and the exclusion at issue there "explicitly excludes[d] coverage for the injury that occurred in the Underlying Action as it was related to Kaur's training of Sangam in the use of 'autos.'" *Id.* The court in *Maxum* noted that it "w[ould] not strain to create ambiguity where none exists." *Id.* In contrast, here, this court has already concluded that the Penn-Star policy's auto exclusion does not plainly and clearly inform the insured that the auto exclusion would be applied in the manner Penn-Star seeks to apply it.

*Second*, the language of the auto exclusion in the Penn-Star policy is different than the language of the auto exclusion that was before the district court in *Maxum*. Penn-Star has directed this court to no binding authority that analyzes the effect of the phrase "by any person" on the auto exclusion. Penn-Star points the court only to two out-of-circuit decisions (one by a federal trial court and one by a state appellate court) analyzing language similar to "by any person," but its reliance on those decisions in unavailing, since the language analyzed by those courts is not the same as the language at issue here *See Fed. Ins. Co. v. New Coal Co.*, 415 F. Supp. 2d 647, 653 (W.D. Va. 2006); *Massachusetts Prop. Ins. Underwriting Ass'n v. Berry*, 80 Mass. App. Ct. 598, 603 (2011). Moreover, Penn-Star simply cites to these two cases, but does not explain why the policies at issue in the contexts of those cases supports its contention that this court should adopt its proffered interpretation of the auto exclusion in its policy. *See Maxum Indem. Co.*, 356 F. Supp. 3d at 1002 ("Exclusions must be viewed in the context of each specific case.").

*Third*, even if this court were to adopt Penn-Star's strained interpretation of its policy's auto exclusion, the decision in *Maxum* is still distinguishable because the plaintiffs in the underlying state court action here are not alleging that their use or ownership—or anyone's use or

ownership for that matter—of a vehicle resulted in bodily injury. *Allstate Ins. Co. v. Naai*, 684 F. Supp. 2d 1220, 1230 (D. Haw. 2010) ("The plain language of the automobile exclusion focuses on the connection between a vehicle and the injury, not between a vehicle and the insured."), *aff'd,* 490 F. App'x 49 (9th Cir. 2012). Instead, the state court complaint alleges that the defendants were negligent in their use, maintenance, and control of the tractor, or the training for the use, maintenance, and control of the tractor. Thus, as alleged in the underlying state court complaint, there is no connection between the use or ownership of the vehicle the plaintiffs in the state court action were travelling in and the injuries they incurred as a result of the collision.

The court finds that the Penn-Star policy's auto exclusion is not plain and clear enough to defeat Golden Labor's reasonable expectation that it was covered for claims arising out of its alleged negligence with respect to using, operating, and/or training others to use the tractor involved in the collision at issue here. Accordingly, the court rejects Penn-Star's interpretation of its auto exclusion and finds that Penn-Star may not rely on that interpretation to preclude coverage.

## CONCLUSION

Having concluded that the Penn-Star policy's auto exclusion does not defeat coverage, the court denies Penn-Star's motion for summary judgment (Doc. No. 32) and also denies Penn-Star's earlier filed motion for summary judgment (Doc. No. 30) as having been rendered moot by the filing of the amended motion for summary judgment. This matter is referred back to the assigned magistrate judge for a further scheduling conference and possible amendment of the scheduling order (Doc. No. 25), if appropriate and in light of this order.

IT IS SO ORDERED.

Dated: **January 31, 2020**

UNITED STATES DISTRICT JUDGE