UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PENN-STAR INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ZENITH INSURANCE COMPANY, et al.,<br><br>Defendants. | No. 1:18-cv-01319-DAD-EPG<br><br>ORDER DENYING PLAINTIFF PENN-STAR INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT ZENITH INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. Nos. 63, 69) |

This matter is before the court on the cross-motions for summary judgment filed by plaintiff Penn-Star Insurance Company ("Penn-Star") and defendant Zenith Insurance Company ("Zenith"). (Doc. Nos. 63, 69.) Pursuant to General Order No. 617 addressing the public health emergency posed by the COVID-19 pandemic, both motions were taken under submission on the papers. (Doc. No. 73.) For the reasons explained below, the court will deny Penn-Star's motion and grant Zenith's motion.

## BACKGROUND

The material facts of this case are undisputed and to the extent relevant to resolution of the pending motions, are set forth below.

/////

/////

**A.    The Parties**[1]

Penn-Star is an insurance company that issued a commercial general liability insurance policy (the "Penn-Star policy") to Golden Labor ("Golden").  (Doc. No. 50 at 3.)  Golden is a labor-services firm that provides farms with laborers.  (*Id.*)  D.M. Camp & Sons ("Camp") is a farm based in Kern County.  (*Id.*)  Valentin Colotl ("Colotl") is a farm contractor.  (*Id.*)  Camp hired Colotl through Golden.  (*Id.*)  Zenith is an insurance company that issued an "agribusiness insurance package policy" to Camp (the "Zenith policy").  (*Id.*)

**B.    The Underlying State Court Action**

On June 27, 2018, the plaintiffs in the state court action filed a complaint in the Kern County Superior Court, naming Golden, Camp, and Colotl as the defendants (the "underlying action" or "state court action").  (Doc. No. 50 at 3.)  That underlying action stems from a collision between an automobile and a tractor pulling a tillage disc in an unincorporated area of Kern County.  (*Id.*)  The automobile in the collision was owned by one plaintiff in the state court action and was driven by another.  (*Id.*)  The driver of the automobile was killed in the collision and the three surviving passengers suffered injuries.  (*Id.*)

The state court complaint alleged that, at the time of the collision, Colotl was operating the tractor that collided with the automobile and that the tractor was owned and entrusted to him by Camp and Golden.  (*Id.*)  Based thereon, the underlying complaint alleged that Colotl, Camp, and Golden were negligent and careless in their ownership, operation, maintenance, and/or control of the tractor, and that their negligence and carelessness caused the tractor to collide with the automobile, thereby causing the decedent's death and the other injuries about which the plaintiffs complain.  (*Id.*)  The underlying complaint further alleged that the negligence of these defendants' is not limited to the ownership, operation, maintenance, and/or control of the tractor but also included the negligent hiring, retaining, training, and/or supervision of persons responsible for the collision.  (*Id.*)

/////

---

[1]  Many of the facts here are repeated from the court's prior order denying plaintiff Penn-Star's previous motion for summary judgment.  (Doc. No. 50.)

Golden and Colotl tendered the underlying action to Penn-Star for defense and indemnification under the Penn-Star policy. (*Id.*) Penn-Star accepted the tender subject to a reservation of its rights, advising Golden and Colotl that it agreed to provide them with defense in the underlying action subject to the terms, conditions, limitations, and exclusions of the Penn-Star policy. (*Id.* at 3–4.) Camp tendered its defense to Zenith, which accepted Camp's defense. (Doc. No. 79 at 11.)

The entire underlying lawsuit was dismissed with prejudice on July 16, 2020, pursuant to the terms of a written settlement agreement. (*Id.* at 12.) As consideration for the settlement, Penn-Star and Zenith agreed to pay a combination of upfront cash and future periodic payments with a total present cash value of $2 million, with $1 million funded by each. (*Id.*)

**C.    The Farm Labor Contractors Services Agreement**

At the time of the accident at issue, Camp had hired Colotl through Golden pursuant to the terms of a written Farm Labor Contractors Services Agreement. (Doc. No. 79 at 3.) With respect to the parties' obligations to procure insurance, the Farm Labor Contractors Services Agreement provided in pertinent part:

> B. Insurance: [Golden] will provide and maintain in force at his own expense the following insurance: . . .
>
> (2) General comprehensive liability and property damage liability insurance with a combined single liability limit of no less than One Million Dollars ($1,000,000) and a general aggregate of no less than Two Million Dollars ($2,000,000), with Camp named as an additional insured. (Penn Star Insurance Co. Policy Number CPV0014424, with an expiration date of 2/19/2018.
>
> (3) [Golden] will deliver to Camp before the signing of this contract, certificates of insurance stating that the above insurance is in effect . . .. Underwriters will have no right to recovery or subrogation against Camp, its divisions, affiliates, or subsidiary companies, it being the intention of the parties that the insurance so affected shall protect both parties and be primarily liable for any and all losses covered by the above described insurance. It is further understood that the insurance provided by [Golden] under this Agreement shall be primary insurance for all assureds, and such other insurance carried by Camp and its affiliated and subsidiary companies shall not be called upon by [Golden's] insurers for contributing, deficiency, concurrent or double insurance or otherwise . . ..

/////

3

**D.    The Penn-Star Insurance Policy**

Penn-Star issued its policy, insurance policy number CPV0014424, to Golden for the period of February 19, 2017 to February 19, 2018. (Doc. No. 79 at 4.) The liability insurance insuring agreement in the Penn-Star policy generally agrees to pay for damages that an insured becomes legally obligated to pay because of bodily injury caused by an occurrence that takes place during the policy period. (*Id.* at 5.) In addition, the Penn-Star policy agrees to defend an insured against any suit seeking such damages, subject to the policy's exclusions and other limitations. (*Id.*) The Penn-Star policy contains the following relevant language:

> A. Section II – Who is An Insured is amended to include as an additional insured any person or organization when you and such person or organization have agreed in writing in a contract, agreement, or permit, that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage", or "personal and advertising injury" caused, in whole or in part, by:
>
> 1. Your acts or omissions; or
>
> 2. The acts or omissions of those acting on your behalf; in the performance of your ongoing operations for the additional insured or in connection with your premises rented to you.
>
> However, the insurance afforded to such additional insured:
>
> 1. Only applies to the extent permitted by law;
>
> 2. Will not be broader than that which you are required by the contract or agreement to provide for such additional insured; and
>
> 3. Only applies to "occurrences" or coverages not otherwise excluded under this policy.

(*Id.* at 6–7.)

The Penn-Star policy also contains the following "Other Insurance" clause:

> a. Primary Insurance
>
> This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

/////

4

    b. Excess Insurance

    (1) This insurance is excess over:

    (a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

     (i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

     (ii) That is Fire insurance for your premises rented to you or temporarily occupied by you with permission of the owner;

     (iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

     (iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I – Coverage A – Bodily Injury And Property Damage Liability.

    (b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and complete operations, for which you have been added as an additional insured.

**E. The Zenith Policy**

Zenith issued a package of insurance policies to Camp, bearing policy number CFP 00013032-03, effective March 1, 2017 to March 1, 2018. (*Id.* at 8.) Those policies purport to offer three forms of liability coverage: general liability, farm liability, and umbrella liability. (Doc. No. 63 at 9.) All three policies generally afford coverage to an insured for "bodily injury" and "property damage." (Doc. No. 68 at 3–10.) Additionally, all three policies contain an "Other Insurance" clause.

The "Other Insurance" clauses in the Zenith policy provide in pertinent part:

  6. Other Insurance

  a. If there is any other liability insurance under any other policy;

   (1) Issued by any other insurer, or self insurance or similar protection, that applies to a loss covered by Coverages H or I of this Coverage Form, then Coverages H and I shall be excess over that other insurance.

   (2) Issued by us that applies to a loss covered by this Coverage Form, then only the highest applicable Limit of Insurance shall apply to

5

> such a loss. This condition does not apply to any policy issued by us which provides Excess or Umbrella liability insurance.
>
> . . .
>
> c. Whenever Coverages H or I under this Coverage Form are excess, we will have no duty to defend any claim or "suit" that any other insurer has a duty to defend. However, if no other insurer defends a claim or "suit" covered under Coverages H or I, we will undertake to do so, but we will be entitled to your rights against all those other insurers.

(Doc. No. 79 at 8–9.) The Zenith policy also has an "Anti-Stacking of Limits/Other Insurance Endorsement," which provides in relevant part:

> OTHER INSURANCE
>
> This insurance is excess over, and shall not contribute with any other insurance, self-insurance, or other similar protection that applies to a loss covered by Coverage H or I of this policy.
>
> Whenever Coverages H or I under this policy are excess, we will have no duty under Coverages H or I to defend an "insured" against any claim or "suit" if any other insurer has a duty to defend. However, if no other insurer defends a claim or "suit" covered under Coverages H or I, we will undertake to do so, but we will be entitled to your rights against all those other insurers.

(*Id.* at 9–10.)

## ANALYSIS

Penn-Star and Zenith filed cross-motions for summary judgment against one another on their respective complaint and counterclaim, seeking equitable contribution and reallocation in connection with the defense and settlement of the underlying action in the Kern County Superior Court. (Doc. Nos. 63, 69.) Penn-Star seeks reimbursement for its defense and indemnity of Golden and Colotl and Zenith seeks reimbursement for its defense of Camp. The court will address the two separate motions in turn below.

**A. Penn-Star's Motion for Summary Judgment**

Penn-Star seeks contribution and reallocation from Zenith of the combined $1,169,088.98 that Penn-Star spent on behalf of Colotl and Golden to defend and resolve the underlying action for those two parties. (Doc. No. 63 at 6.) Penn-Star seeks this contribution from Zenith based on the notion that Zenith's insurance policies allegedly covered Colotl and Golden on a primary

6

1   basis. (*Id.*)  In the alternative, Penn-Star seeks a pro-rata reallocation of the sums expended
2   according to the policies' respective limits of liability.  (*Id.*)

3          1.      <u>Whether Colotl and Golden Qualify as Insureds Under the Zenith Policy</u>

4          The initial issue the parties ask the court to resolve is whether Colotl and Golden qualify
5   as insureds under the Zenith policy, which would give rise to a duty to defend and/or indemnify.
6   The court, however, does not find it necessary to address this issue for two reasons.  First,
7   in its opposition to Penn-Star's motion, Zenith concedes that Colotl qualifies as an insured.  (Doc.
8   No. 74 at 7.)  Second, as explained below, the court concludes that Penn-Star's insurance is
9   primary to Zenith's for the purpose of indemnifying and defending Golden, regardless of whether
10  Golden qualifies as an insured under Zenith's policy.  Accordingly, the court will proceed to its
11  analysis which leads to the conclusion that Penn-Star's policy is primary.

12         2.      <u>Whether Penn-Star's Policy is Primary to Zenith's</u>

13         Primary insurance is coverage that applies immediately upon the happening of an
14  occurrence that gives rise to liability for the insured.  *See, e.g.*, *Olympic Ins. Co. v. Employers*
15  *Surplus Lines Ins. Co.*, Cal. App. 3d 593, 597 (1981).  Excess insurance is coverage that applies
16  only after primary coverage has been exhausted.  *Id.*  Primary insurers and excess insurers have
17  different obligations.  Not only must a primary insurer indemnify its insured for losses covered
18  under its policies, but it must also defend its insured whenever the insured faces liability that may
19  even potentially be covered under the policies.  *Montrose Chem. Corp. v. Superior Court*, 6 Cal.
20  4th 287, 295 (1993).

21         In its pending motion for summary judgment, Penn-Star argues that Zenith's policy was
22  primary with respect to Colotl and Golden because "the policy covering an 'owned automobile
23  shall be primary and the insurance afforded by any other policy or policies shall be excess[.]'"
24  (Doc. No. 63 at 14.)  However, recognizing that there is no statutory or caselaw authority
25  addressing the situation of a driver of a farm tractor, Penn-Star argues that the common-law rule
26  is that the owner of any vehicle's insurer is obligated to satisfy the whole judgment.  (*Id.*)

27         In contrast, Zenith argues that Penn-Star's policy is primary to Zenith's.  (Doc. No. 74 at
28  9.)  Zenith contends that Penn-Star's argument would only have merit if the accident at issue

involved the use of an "auto" and that this court has already rejected that argument in its previous order denying Penn-Star's prior motion for summary judgment (Doc. No. 50). (*Id.* at 11.) According to Zenith, the court must instead consider the policies' "other insurance" provisions and "when the 'other insurance' provisions are compared here . . . it is the Penn-Star policy that affords primary insurance for this loss, and Zenith's policy must be deemed excess." (*Id.*at 12–13.)

In its reply, Penn-Star contends that Zenith's "other insurance" clause amounts to "a classic escape clause purporting to eliminate coverage entirely based on the existence of other insurance and thus is unenforceable under California law." (Doc. No. 80 at 5.)

The court finds Zenith's arguments persuasive. Both Penn-Star and Zenith included "other insurance" clauses in their policies. The Penn-Star "other insurance" clause states that its coverage will be excess in situations where: (1) Insured has insurance for its work under Fire, Extended, Coverage, Builder's Risk, or Installation Risk insurance policies; (2) Insured has "Fire" insurance for premises it is renting; (3) Insured has purchased insurance covering its liability as a tenant; (4) "the loss arises out of the maintenance or use of aircraft, 'autos' or watercraft" that is not otherwise excluded by the Penn-Star policy; or (5) Certain other types of insurance where Insured has been "added as an additional insured." (Doc. No. 79 at 6–7.) In contrast, the Zenith "other insurance" clause provides that "this insurance is excess over, and shall not contribute with any other insurance, self-insurance, or other similar protection that applies to a loss covered by [the liability insurance sections] of this policy." (Doc. No. 70 at 14.)

An escape clause is a clause providing that if there exists other insurance covering the same insured, the insurer will not cover the loss at all. *Atain Specialty Ins. Co. v. Sierra Pacific Management Co.*, No. 2:14-cv-00609-TLN-DB, 2016 WL 6568678, at *7 n. 11 (E.D. Cal. Nov. 3, 2016). Zenith's "other insurance" clause in its policy is thus clearly an escape clause. The court recognizes that escape clauses are generally disfavored as a matter of public policy. *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 1304 (1998). Indeed, it is well-settled in California that "[e]xcess-only clauses" such as those at issue here, "by which carriers seek exculpation whenever the loss falls within another carrier's policy limit," are deserving of

considerable judicial distrust. *Dart Industries, Inc. v. Commercial Union Ins. Co.*, 28 Cal. 4th 1059, 1080 (2002) (internal quotation marks and citation omitted).[2] However, that distrust principle primarily applies where both policies purport to be excess for the same insured on the same facts, such that one cannot be given effect without disregarding the other. *Id.* at 1078 n.6 ("Other insurance clauses become relevant only where several insurers insure the same risk at the same level of coverage.") Thus, this distrust of escape clauses is only applicable if there is an actual conflict between the two "other insurance" clauses. *California State Auto. Ass'n Inter-Ins. Bureau v. Progressive Casualty Ins. Co.*, No. 11-cv-1747-MEJ, 2012 WL 1438835, at *3 (N.D. Cal. Apr. 25, 2012). Reading the plain language of the clauses at issue here, the court concludes that they do not conflict.

The court in *Hartford Casualty Ins. Co. v. Travelers Indemnity Co.* addressed the relevance of non-conflicting policies:

> As noted in *Fireman's Fund* and *Commerce & Industry*, the problem posed to those courts involved policies that each claimed to be excess whenever there was other insurance. Literal enforcement of the policy language would have left the insured without coverage. This equitable consideration led the courts to ignore the excess only clauses because they in fact would serve as escape clauses for the insurers—a result that could not have been intended by the policyholders.

*Hartford Casualty Ins. Co. v. Travelers Indemnity Co.*, 110 Cal. App. 4th 710, 727 (2003). By contrast, "courts will generally honor the language of excess 'other insurance' clauses when no prejudice to the interests of the insured will ensue." *Id.* at 725. Here, as in *Hartford*, "because the policy terms, as they apply in this case, do not conflict or offend public policy and do not infringe on any rights of the insured, there is no reason to disregard the express terms of both policies." *Id.* at 727. Both Golden and Colotl will be insured and covered if the court determines that both Zenith's and Penn-Star's "other insurance" clauses are valid, particularly because of the

---

[2] As one district court has explained "the court in *Dart* did not decide the question of whether 'other insurance' clauses control in disputes between two insurers." *Financial Pacific Ins. Co. v. Amco Ins. Co.*, No. 2:05-cv-2099-GEB-CMK, 2007 WL 685856, at *2 (N.D. Cal. Mar. 5, 2007). Moreover "*Dart*'s dicta would only apply to insurers at the same level of risk that had mutually repugnant other insurance clauses," which is not the case here. *California State Auto. Ass'n Inter-Ins. Bureau*, 2012 WL 1438835, at *3 n.5.

narrow circumstances in which the Penn-Star policy's escape clause applies. Therefore, the court concludes that the plain language of Zenith's policy, which states that it will be excess over similar other insurance protections relating to bodily injury and property damage (Doc. No. 79 at 9–10), prescribes that Penn-Star's policy is primary with respect to Colotl and Golden's liability in the underlying action. Accordingly, Penn-Star's motion for summary judgment seeking reimbursement will be denied.[3]

**B.      Zenith's Motion for Summary Judgment**

In its pending motion, Zenith claims that Penn-Star owed a duty to defend Zenith's named insured (Camp) as an additional insured under the policy Penn-Star issued to Golden. (Doc. No. 70 at 10.) Zenith argues that Penn-Star should therefore be required to reimburse Zenith for the full $285,992.35 that Zenith expended in defending Camp in the underlying state action.

1.      <u>Whether Camp Qualifies as an Insured Under Penn-Star's Policy</u>

"It is . . . a familiar principle that a liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal 4th 1076, 1081 (1993), *as modified on denial of reh'g* (May 13, 1993). "[T]he [insurer] must defend a suit which *potentially* seeks damages within the coverage of the policy." *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 (1966). "The determination [of] whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." *Horace Mann*, 4 Cal. 4th at 1081. In analyzing the policy, "courts must consider both the [] language in the policy, and the endorsements or exclusions affecting coverage, if any, included in the policy terms." *Modern Dev. Co. v. Navigators Ins. Co.*, 111 Cal. App. 4th 932, 939 (2003), *as modified* (Aug. 29, 2003), *as further modified* (Sept. 18, 2003).

---

[3] Although not explicitly part of the Penn-Star policy, it is worth noting that the Farm Labor Contractors Services Agreement entered into by Golden and Camp states that Golden will provide and maintain insurance with Camp as a named additional insured. (Doc. No. 65 at 121.) Moreover, the Agreement states that the insurance provided by Golden shall be primary, "and such other insurance carried by Camp and it's affiliated and subsidiary companies shall not be called upon by [Golden's] insurers for contributi[on], deficiency, concurrent or double insurance or otherwise." (*Id.* at 122.) As discussed above, the insurance that Golden provided is the Penn-Star policy and the insurance that Camp provided is the Zenith policy.

"Facts known to the insurer and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy." *Montrose Chem Corp.*, 6 Cal. 4th at 296. "Facts merely tending to show that the claim is not covered or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage . . . add no weight to the scales." *Id.* at 300. Accordingly, for Penn-Star to establish that it had no duty to defend Camp in the underlying action, it must show that the underlying claims against Camp did not fall within the Penn-Star policy's coverage. *Travelers Indemnity Co. of Conn. v. Hudson Ins. Co.*, 442 F. Supp. 3d 1259, 1271 (E.D. Cal. 2020).

Zenith argues that Camp qualifies as an insured under Penn-Star's policy because that policy's definition of insured includes "any person or organization when [Golden] and such person or organization have agreed in writing in a contract, agreement, or permit, that such person or organization be added as an additional insured on [the Penn-Star] policy." (Doc. No. 70 at 11.) According to Zenith, the Farm Labor Contractors Services Agreement entered into by Camp and Golden satisfies this requirement "because Golden agreed to name Camp as an additional insured." (*Id.* at 11–12.) Moreover, Zenith contends that the Penn-Star policy itself "provides that Camp is an additional insured when sued 'in whole or part' for: (1) Golden's 'acts or omissions' (or the acts or omissions of those acting on Golden's behalf); (2) in the performance of Golden's ongoing operations for Camp." (*Id.* at 12.) Zenith also points out that the complaint in the underlying state court action sought to hold each defendant liable for the conduct of the others. (*Id.*) This, Zenith concludes, was enough "to create the possibility that Camp would be held vicariously liable for the acts of Golden . . . which makes Camp an insured under the Penn-Star policy." (*Id.* at 12.) At the very least, Zenith asserts, "at the time of tender Penn-Star could not *rule out* that possibility, which was all that was required to trigger its duty to defend Camp." (*Id.*) (emphasis in original.)

In its opposition, Penn-Star argues that its policy does not name Camp as an insured or an additional insured. (Doc. No. 77 at 6.) More precisely, Penn-Star contends that although its policy extends additional-insured status to those whom the named insured (here, Golden) has

1  agreed to add, Camp does not qualify as such.  (*Id.*)  As Penn-Star points out, its policy states that
2  "such a party qualifies as 'an additional insured only with respect to liability for "bodily injury" . .
3  . caused, in whole or in part, by' conduct 'on [Golden Labor's] behalf . . . in the performance of
4  [Golden Labor's] ongoing operations for [Camp] . . ..'"  (*Id.*)  Consistent with the foregoing,
5  Penn-Star suggests that "[t]he question here then is whether Camp was alleged to be liable in the
6  *Garcia* action for injury proximately caused by Golden Labor's ongoing operations for Camp."
7  (*Id.*)  According to Penn-Star, Golden's responsibilities under the Farm Labor Contractors
8  Services Agreement included the mere leasing of labor services and had nothing to do with the
9  actual tasks performed by the laborers.  (*Id.* at 8.)  Specifically, Penn-Star points out that
10 Golden's duties were simply to manage Colotl's wages and benefits.  (*Id.*)  Penn-Star argues that
11 Camp, on the other hand, set Colotl's work hours and told Colotl what work to perform.  (*Id.*)
12 ("On the job, Colotl followed the instruction of Camp supervisors, who exercised sole control
13 over Colotl's activities at the job site.")  Penn-Star thus concludes that "Zenith cannot legally
14 claim coverage for Camp under Penn-Star's additional-insured endorsement, which extends
15 coverage for Camp's liability only when proximately caused by conduct 'in the performance of
16 [Golden Labor's] ongoing operations for [Camp].'"  (*Id.* at 10.)

17     In its reply, Zenith argues that it need not prove that the accident in question resulted from
18 Golden's operations for Camp because Zenith's motion "only concerns Penn-Star's duty to
19 defend Camp."  (Doc. No. 83 at 2.)  Zenith claims that it "need only demonstrate that the
20 allegations of the *Garcia* complaint (and other information known to Penn-Star) created the
21 *possibility* that Camp could face liability for 'bodily injury' 'caused in whole or in part' by
22 Golden or someone acting on Golden's behalf, in the course of Golden's ongoing operations for
23 Camp."  (*Id.*)  Zenith contends that it has met this burden.  According to Zenith, what is at issue is
24 merely the extent of the Farm Labor Contractors Services Agreement between Camp and Golden.
25 (*Id.*)  Zenith states that it is undisputed that under the Farm Labor Contractors Services
26 Agreement, Golden agreed to:  (1) "furnish sufficient labor to perform the services required" by
27 Camp; and (2) "hire, supervise and manage sufficient laborers as determined by [Golden], to
28 conduct planting, suckering, pulling leaves, tipping and harvesting grapes or any other related

agricultural operation [Golden] is qualified to perform and which [Camp] retains [Golden] to conduct on the property." (*Id.* at 2–3.) Zenith advances that this language confirms at least the possibility that Camp would be liable for Golden's operations. (*Id.* at 3.) Finally, Zenith argues that any evidence Penn-Star points to about the actual scope of Golden's operations was developed during the underlying state court litigation and "Penn-Star may not rely on facts developed during the *Garcia* suit, or at any time after it refused to defend to justify its decision." (*Id.* at 3.)

It is undisputed that the complaint in the underlying state court action alleged that "Defendants, and each of them, did negligently and carelessly own, rent, lease, bail, entrust, operate, repair, maintain, and control a motor vehicle so as to cause the same to collide with a motor vehicle . . . thereby causing decedent's death, and thereby proximately cause the damages to plaintiffs as alleged herein." (Doc. No. 79 at 2–3.) That complaint further alleged, "Defendants, and each of them, were the agents, representative, and/or employees of each of the remaining defendants, and were acting within the course and scope of such agency, representation, and/or employment." (*Id.* at 3.) These allegations, when combined with the language of the Farm Labor Contractors Services Agreement, clearly raise the possibility that Camp could be held liable for "bodily injury" "caused in whole or in part" by the acts or omissions of Golden, which in turn would saddle Penn-Star with a duty to defend Camp. Moreover, because "[t]he defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded . . . or until it has been shown there is *no* potential for coverage," *Montrose Chem.*, 6 Cal. 4th at 295, Penn-Star was obligated to defend Camp in the underlying action or seek a judicial declaration that there was no potential that the underlying action was covered under its policy. *See Truck Ins. Exch. v. Superior Court*, 51 Cal. App. 4th 985, 994 (1996) ("While the underlying action is pending, the carrier can file an action for declaratory relief and attempt to obtain a declaration that no duty to defend or indemnify exists. Such a determination would allow it to withdraw from the defense without subjecting the carrier to a claim of breach of contract or bad faith.") Penn-Star, however, did not seek a judicial declaration that it had no duty to defend Camp prior to declining to defend or indemnify Camp.

1  The law does not allow Penn-Star to disclaim its obligation to defend its insured absent a judicial
2  determination to that effect. *Travelers Indemnity Co. of Conn.*, 442 F. Supp. 3d at 1272.

3  For these reasons, and based upon the undisputed evidence before the court on summary
4  judgment, the undersigned concludes that Penn-Star had a duty to defend Camp in the underlying
5  state court action.

6      2.    <u>Whether Penn-Star's Policy is Primary to Zenith's</u>

7  As with Colotl and Golden above, the court must also determine which of the two
8  insurance policies available to Camp is primary.

9  Zenith argues on summary judgment that the Penn-Star policy expressly states that it will
10 be primary except in certain enumerated situations. (Doc. No. 70 at 13.) Zenith asserts that its
11 own policy, in contrast, specifically provides that it shall be excess where other insurance exists
12 for Camp. (*Id*. at 14.) Thus, Zenith concludes that "[s]ince the undisputed facts confirm that
13 there is another policy—the Penn-Star policy—which affords coverage to Camp for this accident,
14 the Zenith policy must be deemed excess over the Penn-Star policy." (*Id.*)

15 In opposition, Penn-Star again argues that the "other insurance" clauses in Zenith's policy
16 purporting to eliminate Zenith's duties when other insurance exists "are called 'escape' clauses"
17 and are "routinely held to violate public policy." (Doc. No. 77 at 12.) Penn-Star also contends
18 that as a matter of equity the court should not transfer over Camp's risk. (*Id.* at 16.) Penn-Star
19 points out that it "sold a simple general-liability policy for a modest premium of $5,850" while
20 Zenith, on the other hand, "specifically sold multiple coverage forms covering 'tractors' . . . and
21 collected applicable premiums of $22,941 in return." (*Id.*) Equity, Penn-Star suggests, "would
22 not be served by transferring over to Penn-Star a risk Penn-Star neither meant nor charged to
23 cover but Zenith expressly did." (*Id.*)

24 In reply, Zenith repeats the "other insurance" arguments addressed above. Moreover,
25 Zenith argues that equitable considerations do not favor Penn-Star because the Zenith policy that
26 actually afforded coverage for this accident—supposedly the Farm Liability Coverage Form—
27 was "sold for a smaller premium ($3,219.00) than the Penn-Star Policy ($5,850.00)." (Doc. No.
28 83 at 8.)

Zenith's policy clearly provides that it shall be excess where other insurance exists covering Camp. (Doc. No. 79 at 8.) For the same reasons articulated above with respect to Golden and Colotl, the court also concludes that "[b]ecause the policy terms, as they apply in this case, do not conflict or offend public policy and do not infringe on any rights of the insured, there is no reason to disregard the express terms of both policies." *Hartford Casualty Ins. Co.*, 110 Cal. App. 4th at 727. Based on the "other insurance" provisions of the two policies, Penn-Star's policy is primary to Zenith's as to the defense of Camp. Accordingly, the court will grant Zenith's motion for summary judgment.

### 3. Amount of Reimbursement

Because Penn-Star owed the primary and therefore the sole obligation to defend Camp against the underlying state court complaint, Zenith asserts that it is entitled to the total amount that it paid in its defense of Camp—$285,992.35—plus prejudgment interest. (Doc. No. 70 at 16.) Penn-Star argues that Zenith has no right to prejudgment interest. (Doc. No. 77 at 18.)

State law governs prejudgment interest in a diversity action such as this one. *U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1139 (9th Cir. 2011).

California Civil Code § 3287(a) states in pertinent part:

> Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt . . .

Cal. Civ. Code § 3287(a). This statute thus provides that when damages are certain, the recovering party is entitled to interest on those damages. The test for recovery under this provision is "whether [the] defendant actually knows the amount owed or from reasonable available information could the defendant have computed that amount." *Children's Hosp. & Med. Ctr. v. Bonta*, 97 Cal. App. 4th 740, 774 (2002). "When the allocation of liability turns on factual issues, damages are uncertain; however, when the allocation turns exclusively on legal issues, damages are certain and interest is available." *Westport Ins. Co. v. Cal. Casualty Mgt. Co.*, 916 F.3d 769, 782 (9th Cir. 2019). In other words, when the allocation of damages turns on

/////

1  legal issues, the party who owes damages can be said to have known for certain the amount owed,
2  and interest shall therefore be included in any award.

3  Here the court has determined that Penn-Star's policy afforded primary insurance with
4  respect to Camp's defense.  The court's conclusion is based entirely on the resolution of legal
5  issues as opposed to factual issues because the court was required to address only the
6  interpretation of relevant policy language to resolve the parties' dispute.  *Id.*  ("Where the
7  challenge concerns the interpretation of the relevant policy language, the parties present a pure
8  legal question.")  Accordingly, damages are certain here and Zenith is entitled to interest.

9  Under California law, an action for equitable subrogation is entitled to 10% prejudgment
10 interest.  *Id.*  Here, the court has concluded that Zenith has prevailed on a claim for equitable
11 subrogation as opposed to equitable contribution because equitable subrogation "puts the insurer
12 in the position of the insured 'to pursue recovery from third parties legally responsible to the
13 insured for a loss which the insurer has both insured and paid'" whereas equitable contribution "is
14 to 'apportion a loss between two or more insurers who cover the same risk, so that each pays its
15 fair share and one does not profit at the expense of the others.'"  *Id.* (quoting *Fireman's Fund Ins.*
16 *Co.*, 65 Cal. App. 4th 1279).  This action clearly falls into the former category.

**CONCLUSION**

18  For the reasons set forth above,
19  1.   Penn-Star's motion for summary judgment (Doc. No. 63) is denied;
20  2.   Zenith's motion for summary judgment (Doc. No. 69) is granted as follows:
21       a.   Zenith is entitled to equitable subrogation from Penn-Star in the entire
22            amount of $285,992.35 that Zenith expended in defending Camp in the
23            underlying state court action plus prejudgment interest at the rate of 10%
24            per *annum*; and
25  /////
26  /////
27  /////
28  /////

16

3. The Clerk of the Court is directed to enter judgement in favor of Zenith in that amount with interest and to close this case.

IT IS SO ORDERED.

Dated: __October 29, 2021__      _____
UNITED STATES DISTRICT JUDGE