**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PENN-STAR INSURANCE COMPANY, §<br>§<br>§<br>Plaintiff, §<br>v. §<br>§<br>ZENITH INSURANCE COMPANY, §<br>§<br>§<br>Defendant. §<br>§<br>§ | CIVIL ACTION NO. 1:18-cv-1319-LHR-EPG |

**MEMORANDUM AND OPINION**

The parties in this case are two insurance companies that shared the costs of defending and settling a state-court action arising from a fatal collision between a tractor and automobile in Kern County, California. The plaintiff, Penn-Star Insurance Company, seeks to recover its share of the costs from the defendant, Zenith Insurance Company, on the ground that it owed no duty to indemnify or defend the state-court defendants. Both parties have moved for summary judgment. Penn-Star's motion is granted, and Zenith's is denied. A final judgment will be issued separately.

I.     **Background**

A.     **The Accident**

D.M. Camp & Sons owns and operates farms in Kern County, California. (Docket Entry No. 107 at ¶¶ 3, 9). Golden Labor Services LLC provides labor for farming operations. (*Id.* at ¶ 9). Camp and Golden Labor had a "Farm Labor Contractors Services Agreement" (the "Farm Labor Agreement") under which Golden Labor would provide Camp with farm laborers. (*Id.*). Under the Farm Labor Agreement, Golden Labor assigned Valentin Romero Colotl to operate tractors and perform irrigation work on Camp's farm. (*Id.* at ¶ 11).

In November 2017, Mr. Colotl was driving a John Deere tractor, owned by Camp, on North Rancho Drive in Kern County.  (Docket Entry No. 117 at ¶ 4).  Mr. Colotl was returning the tractor to Camp's "yard" at the end of his shift when the tractor collided with a Toyota Camry, killing the Camry's driver, Jaime Silva, Jr., and injuring its passengers, Fidencio Garcia, Joventino Cisneros, and Alberto Garcia.  (Docket Entry No. 107 at ¶¶ 2–4).

The Camry passengers and Silva's parents sued Mr. Colotl, Camp, and Golden Labor in Kern County Superior Court (the "*Garcia*" case), asserting claims for negligence and motor vehicle liability.  (*Id.* at ¶ 7).  The plaintiffs alleged that Camp and Golden Labor were vicariously liable for Mr. Colotl's negligence.  (*Id.* at ¶ 8).  The parties settled the *Garcia* case in July 2020.  (Docket Entry No. 117 at ¶ 13).

## B.    The Insurance Policies

At the time of the accident, Golden Labor had a Commercial General Liability Insurance Policy through Penn-Star.  (Docket Entry No. 107 at ¶ 17).  Camp had Commercial General Liability, Farm Liability, Commercial Umbrella, and Commercial Auto Policies through Zenith.  (Docket Entry No. 117 at ¶¶ 19–21).  Penn-Star defended Golden Labor and Mr. Colotl in the *Garcia* case, subject to a reservation of its right to disclaim defense and indemnity and seek recoupment of all defense fees and costs on the ground that it had no duty to defend or indemnify.  (Docket Entry No. 107 at ¶ 17).  At the same time, Penn-Star tendered the defense and indemnity of Golden Labor and Mr. Colotl to Zenith, contending they also qualified as insureds under Zenith's policy issued to Camp.  (*Id.* at ¶ 19).  Zenith accepted the defense of Camp, but rejected Penn-Star's tender of the defense of Golden Labor and Mr. Colotl.  (Docket Entry No. 112 at ¶ 20).

When *Garcia* settled, Penn-Star and Zenith each agreed to pay $1 million as consideration for the settlement.  (Docket Entry No. 117 at ¶ 14).  Penn-Star paid $169,088.98 in legal fees and costs to defend Golden Labor and Mr. Colotl.  (Docket Entry No. 107 at ¶ 24).  Zenith paid $285,992.35 in legal fees and costs to defend Camp.  (Docket Entry No. 117 at ¶ 16).

### C.     This Lawsuit

In September 2018, Penn-Star initiated this action in the United States District Court for the Eastern District of California.  (Docket Entry No. 1).  Penn-Star seeks declaratory relief that, with respect to *Garcia*: (1) Penn-Star owed no duty to defend Golden Labor, Camp, or Mr. Colotl; (2) Zenith owed a duty to defend and indemnify Golden Labor and Mr. Colotl; and (3) even if Penn-Star owed a duty to defend or indemnify, Zenith's policy is primary over Penn-Star's policy. (Docket Entry No. 13 at 30–33).  Penn-Star also seeks equitable subrogation and contribution of defense expenses.  (*Id.* at 33–34).  Zenith asserts mirror-image counterclaims.  (Docket Entry No. 60).

In March 2019, Penn-Star moved for summary judgment, arguing that the "auto exclusion" endorsement in its policy issued to Golden Labor excluded coverage of the tractor accident. (Docket Entry No. 32).  Judge Dale A. Drozd denied the motion, ruling that the auto exclusion endorsement was unenforceable.  (Docket Entry No. 50).

In October 2020, the parties filed cross-motions for summary judgment.  (Docket Entry Nos. 63, 69).  Penn-Star argued that Zenith's policy was primary with respect to Mr. Colotl's and Golden Labor's liability in *Garcia*.  (Docket Entry No. 63 at 6).  Zenith argued that it was entitled to reimbursement from Penn-Star for its expenses defending Camp because Camp was an additional insured under the Penn-Star policy issued to Golden Labor.  (Docket Entry No. 70 at 10).  Judge Drozd denied Penn-Star's motion and granted Zenith's, ruling that Zenith was entitled

to equitable subrogation from Penn-Star for its expenses defending Camp in *Garcia*, plus prejudgment interest.  (Docket Entry No. 90 at 16).  The court then entered judgment for Zenith. (Docket Entry No. 91).

Penn-Star appealed, and the Ninth Circuit reversed.  (Docket Entry Nos. 101, 102).  The appellate court held that the auto exclusion endorsement in the Penn-Star policy was enforceable and that it applied to the tractor accident.  (Docket Entry No. 101).  The auto exclusion endorsement excluded coverage for "'bodily injury' or 'property damage' arising out of the ownership, maintenance or use by any person or entrustment to others, of any aircraft, 'auto,' or watercraft."  The Ninth Circuit held that the Toyota Camry involved in the accident "clearly qualifies as 'any . . . auto' 'use[d] by any person.'"  (*Id.* at 3) (alteration in original).  "Thus, the collision . . . was conspicuously, plainly, and clearly outside Penn-Star's coverage."  (*Id.* at 4).

Following remand, the case was reassigned to Judge Ana de Alba.  (Docket Entry No. 104). In April 2023, Penn-Star again moved for summary judgment, arguing that the case had become "unusually simple" in light of the Ninth Circuit's decision—Zenith was responsible for the entire defense and settlement of *Garcia*, and Penn-Star's policy afforded no coverage.  (Docket Entry No. 106 at 19).  Zenith filed a response and cross-motion for summary judgment.  (Docket Entry Nos. 111, 113).  Zenith conceded that it was legally responsible for defense costs but requested that the court "balance the various equities" and order only partial reimbursement of defense costs to Penn-Star.  (Docket Entry No. 111 at 18–21).  Zenith did not concede responsibility for the settlement payment, arguing that its policies provided no coverage for the $1 million Penn-Star paid toward the settlement.  (*Id.* at 11–18).  Penn-Star replied in support of its motion for summary judgment and in opposition to Zenith's cross-motion.  (Docket Entry No. 118).  Zenith replied in support of its cross-motion, (Docket Entry No. 119), and Penn-Star moved for leave to file a

supplemental brief responding to "new evidence and arguments" in Zenith's reply.  (Docket Entry No. 124).

In February 2024, the case was assigned to this court, which is temporarily performing judicial duties in the United States District Court for the Eastern District of California to ease the backlog in that overburdened district.  (Docket Entry No. 128).

In March 2024, the court heard argument on the cross-motions for summary judgment. (Docket Entry No. 130).  The court granted Penn-Star's motion for leave to file a supplemental brief in response to Zenith's reply brief.  (*Id.*).  The court also ordered the parties to submit supplemental briefing on the issue of whether Zenith's policies insured Golden Labor for Mr. Colotl's operation of the tractor because Golden Labor was vicariously liable as Mr. Colotl's employer.  (*Id.*).  The parties filed their supplemental briefs on March 22, 2024.  (Docket Entry Nos. 131, 132).

The parties' cross-motions for summary judgment are ripe for consideration.  Based on the record, the briefing, oral argument, and the applicable law, Penn-Star's motion for summary judgment is granted, (Docket Entry No. 106), and Zenith's cross-motion for summary judgment is denied, (Docket Entry No. 113).  The reasons are set out below.

## II.    The Rule 56 Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing that there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L.Ed.2d 265

(1986).  If the moving party meets its burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial."  *Galen*, 477 F.3d at 658.  The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L.Ed.2d 686 (2007).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks and quoting reference omitted) (alteration adopted).  The court "must review the evidence submitted in support of each cross-motion."  *Id.*

## III.    Analysis

Penn-Star seeks reimbursement from Zenith for (1) its share of the payment to settle the *Garcia* action and (2) its costs and expenses defending Golden Labor and Mr. Colotl.  The standard for the duty to indemnify is different from the standard for the duty to defend.  A duty to indemnify is owed only when there is actual coverage, but a duty to defend exists if there is potential coverage. Accordingly, the court analyzes Penn-Star's claim for reimbursement of its settlement payment separate from its claim for reimbursement of defense costs.

### A.    The Duty to Indemnify

Zenith argues that it is not responsible for reimbursing Penn-Star for the $1 million it contributed to the *Garcia* settlement because none of its policies provided indemnity coverage to the *Garcia* defendants.  (Docket Entry No. 113 at 11).   First, Zenith argues that its Commercial General Liability and Farm Liability Policies do not provide coverage because of their anti-stacking endorsements.   Second, Zenith argues that its Commercial Umbrella Policy does not provide coverage because of its auto coverages exclusion.  Third, Zenith argues that Penn-Star is

equitably barred from recovering its portion of the settlement payment because it failed to produce a document in discovery that, according to Zenith, would have changed the Ninth Circuit's ruling. And fourth, Zenith argues that none of its policies provides coverage for Golden Labor's liability because Golden Labor was not vicariously liable for Mr. Colotl's operation of Camp's tractor.  The court addresses each argument in turn.

### 1.    The Commercial General Liability and Farm Liability Policies

Zenith argues that Penn-Star's $1 million settlement payment is not covered by its Commercial General Liability and Farm Liability Policies because of the Policies' anti-stacking endorsements.  The anti-stacking endorsements, which appear in both policies, provide:

> If this policy's coverage and any other coverage under any other policy, coverage part, coverage form or endorsement issued to an insured by us or any company affiliated with us applies to the same accident, "occurrence", injury, loss or damage, the most we will pay under all such coverages is the actual amount of the injury, loss or damage up to and not exceeding, the single highest applicable Limit of Insurance under any one type of applicable coverage.  This condition does not apply to any policy issued by us or an affiliated company specifically to apply as excess insurance over this policy.

(Docket Entry No. 117 at ¶ 19).

Both Zenith's Commercial General Liability and Farm Liability Policies have a $1 million insurance limit.  (*Id.* at ¶ 20).  Zenith contends that that limit was reached when it paid $1 million to settle *Garcia*, so that any additional coverage could come only from Zenith's Commercial Umbrella Policy.  (Docket Entry No. 113 at 12).  Zenith relies on the declaration of Joe Peterson— Zenith's vice president of property, casualty, and litigation claims—to establish that its $1 million share of the settlement payment is "being paid under the Zenith Farm Liability Policy."  (Docket Entry No. 115 at ¶ 7).

Penn-Star responds that "Zenith's subjective decisions about allocation among its forms is inadmissible and, even if it were not, it would not bind this Court."  (Docket Entry No. 118 at 18–

19).  Invoking the court's "equitable judicial discretion," Penn-Star urges the court to "allocate the $1 million paid by Penn-Star to Zenith's [Commercial General Liability] or Farm Liability forms and allocate Zenith's own $1 million *Garcia* settlement contribution to the Zenith umbrella form." (*Id.* at 19); (Docket Entry No. 118-2 at 2 (citing *Centennial Ins. Co. v. U.S. Fire Ins. Co.*, 88 Cal. App. 4th 105, 111 (2001))).

The court agrees that Zenith's Commercial General Liability and Farm Liability Policies do not together provide coverage exceeding $1 million because of the anti-stacking endorsements. Whether Zenith must reimburse Penn-Star for its share of the settlement turns on Zenith's Commercial Umbrella Policy.  The court need not decide whether Mr. Peterson's declaration statement about allocation among forms is admissible, nor whether the court should exercise its equitable powers to reallocate Zenith's settlement payment among the forms.

### 2.    The Auto Coverages Exclusion

Zenith's Commercial Umbrella Policy, like Penn-Star's policy, has an auto coverages exclusion.  Zenith argues that there is "no substantive difference" between its exclusion and Penn-Star's, so that "there is no reason why" the Ninth Circuit's ruling "shouldn't apply to Zenith's auto coverages exclusion and bar coverage for Penn-Star's attempt to recover the one-million-dollar settlement under the Zenith umbrella policy."  Below, the court addresses Zenith's claim that its auto exclusion is not substantively different from Penn-Star's.  The court then addresses Zenith's argument that the plain text of the exclusion encompasses the tractor accident underlying the *Garcia* case.  Both turn on how California law governs the interpretation and enforceability of exclusionary clauses in insurance policies.

The "ordinary rules" of contractual interpretation apply to insurance contracts.  *FlorExpo LLC v. Travelers Prop. Cas. Co. of Am.*, 524 F. Supp. 3d 1051, 1055 (S.D. Cal. 2021) (quoting *N.*

*Am. Building Maint., Inc. v. Fireman's Fund Ins. Co.*, 137 Cal. App. 4th 627, 40 Cal. Rptr. 3d 468, 479 (2006)). The goal is "to give effect to the mutual intention of the parties as it existed at the time of contracting." CAL. CIV. CODE § 1636. If the contract is written, "the intention of the parties is to be ascertained from the writing alone, if possible." *Id.* § 1639; *see also Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 13 Cal. Rptr. 3d 68, 89 P.3d 381. 385 (2004). If the contractual language is "clear and explicit," then it governs. CAL. CIV. CODE § 1638; *see also Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 10 Cal. Rptr.2d 538, 833 P.2d 545, 551 (Cal. 1992); *Blackhawk Corp. v. Gotham Ins. Co.*, 54 Cal. App. 4th 1090, 63 Cal. Rptr. 2d 413, 418 (1997) ("[W]here the language of a contract is clear, we ascertain intent from the plain meaning of its terms and go no further."). But if the contract is "in any respect ambiguous or uncertain," it must be interpreted to protect the "objectively reasonable expectations of the insured." *N. Am. Bldg. Maint., Inc. v. Fireman's Fund Ins. Co.*, 137 Cal. App. 4th 627, 641, 40 Cal. Rptr. 3d 468, 479 (2006) (quotation marks and citations omitted). To determine whether coverage is consistent with the insured's objectively reasonable expectations, the language must be interpreted "in context, with regard to its intended function in the policy." *Id.* The contract's words "are to be understood in their ordinary and popular sense . . . unless used by the parties in a technical sense, or unless a special meaning is given to them by usage." CAL. CIV. CODE § 1644; *see also MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 3 Cal. Rptr. 3d 228, 73 P.3d 1205, 1213 (2003).

In addition to these general policy interpretation principles, "particular rules apply to the interpretation of insurance policy exclusions." *FlorExpo*, 524 F. Supp. 3d at 1056 (quoting *N. Am. Building Maint.*, 40 Cal. Rptr. 3d at 479) (alteration adopted). "An exclusion limits or takes back some of the insurance coverage granted by the insuring clause." *Id.* (quoting *Essex Ins. Co. v. City of Bakersfield*, 154 Cal. App. 4th 696, 65 Cal. Rptr. 3d 1, 10 (2007)). Because exclusions

9

"limit coverage granted by an insuring clause," they "apply only to hazards covered by the insuring clause." *Id.* (quoting *Old Republic Ins. Co. v. Superior Court*, 66 Cal. App. 4th 128, 77 Cal. Rptr. 2d 642, 652 (1998)). "[E]xclusionary clauses are strictly construed against the insurer and in favor of the insured." *N. Am. Building Maint.*, 40 Cal. Rptr. 3d at 479 (citation omitted). Accordingly, "although the insured has the burden of proving the contract of insurance and its terms, the insurer bears the burden of bringing itself within a policy's exclusionary clauses." *FlorExpo*, 524 F. Supp. 3d at 1056.

Exclusionary clauses are "subject to two separate tests." *Baldwin v. AAA N. California, Nevada & Utah Ins. Exch.*, 1 Cal. App. 5th 545, 553, 204 Cal. Rptr. 3d 433, 440 (2016), *as modified* (July 13, 2016). First, the limitation must be "conspicuous with regard to placement and visibility." *Id.* (quotation marks and quoting reference omitted). Second, the language must be "plain and clear." *Id.* (quotation marks and quoting reference omitted). To be plain and clear, the exclusion must be "stated precisely and understandably, in words that are part of the working vocabulary of the average layperson." *Haynes*, 32 Cal. 4th at 1204. An exclusionary clause that is not "conspicuous, plain, and clear" is unenforceable. *Id.* "The burden of making coverage exceptions and limitations conspicuous, plain and clear rests with the insurer." *Id.*

Zenith's Commercial Umbrella Policy contains the following insuring clause:

> We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted.

> When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend any insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. At our discretion, we may investigate any

> "occurrence" that may involve this insurance and settle any resultant claim or "suit", for which we have the duty to defend.

(Docket Entry No. 65 at 273).

This insuring clause is subject to several exclusions, including the auto coverages exclusion at issue here:

> This insurance does not apply to:
>
> . . .
>
> **h.    Auto Coverages**
>
> (1) "Bodily injury" or "property damage" arising out of the ownership, maintenance, operation, "loading or unloading", entrustment to others, or use of any "auto" which is not a "covered auto[.]"

(*Id.* at 278).

Zenith argues that this exclusion applies to the accident underlying the *Garcia* case for the same reason that the Ninth Circuit determined that Penn-Star's auto coverages exclusion applied. This argument rests on the premise that the two exclusions are not "substantive[ly] differen[t]," so that, following the reasoning of the Ninth Circuit, there would be no basis to apply Penn-Star's exclusion but not Zenith's.  To examine this argument, it is necessary to briefly summarize the Ninth Circuit's opinion.

The Ninth Circuit first set out the language of Penn-Star's auto coverages exclusion, adding its own italics:

> The Penn-Star policy contains a specific endorsement excluding coverage for "'[b]odily injury' or 'property damage' arising out of the ownership, maintenance or use *by any person* or entrustment to others, of *any* aircraft, 'auto,' or watercraft." (Emphasis added).

(Docket Entry No. 101 at 2).  The Ninth Circuit then noted that the version of the exclusion that the endorsement replaced was "narrower" because it "had excluded from coverage bodily injury or property damage arising out of the 'ownership, maintenance, use or entrustment to others of any

aircraft, 'auto' or watercraft owned or operated by or rented or loaned *to any insured*."   (*Id.*) (emphasis added by the Ninth Circuit).

Based on the language of the exclusion and the language it replaced, the Ninth Circuit held that the exclusion plainly and clearly applied to the accident even though "the Toyota Camry was not owned or operated by any insured party."  (*Id.* at 3).  The court distinguished *Essex Insurance Company v. City of Bakersfield*, 65 Cal. Rptr. 3d 1 (Cal. Ct. App. 2007), on the basis that:

> The relevant provision in *Essex* did not specify whether the exclusion pertained broadly to any person or merely to any insured.  Here, by contrast, Penn-Star's auto exclusion specifically applied to the use of 'any' auto 'by any person.'"  In addition, unlike in *Essex*, Penn-Star's auto exclusion endorsement specifically replaced an earlier provision that only excluded autos "operated by . . . any insured."  And unlike *Essex*, this is not a case in which the collision took place between vehicles that were wholly unconnected to the insured parties; here, the tractor was driven by Golden Labor's employee and owned by Camp, which was an "additional insured" under the Penn-Star policy.

(*Id.* at 3–4).

Because the exclusionary language in *Essex* is similar to the language in Zenith's auto coverage exclusion, it is useful to briefly summarize *Essex*.  In that case, the City of Bakersfield organized a fundraising event and purchased liability insurance covering that event.  *Id.* at 699–700.  An automobile collided with a tractor on a highway near the parking lot for the event.  *Id.* Neither driver was an employee or agent of the City, and the vehicles were not connected with the City in any way.  *Id.* at 700.  The automobile driver sued the City, alleging that its negligence in locating and managing the event and managing the surrounding traffic proximately caused the driver's injuries.  *Id.*  The question before the court of appeals was whether the insurer had a duty to defend and indemnify the City under the liability insurance policy.  The insurer argued it did not because the following two exclusions applied:

> **[1]** This insurance does not apply to 'bodily injury' or 'property damage' arising out of, caused by or contributed to by the ownership, non-ownership, maintenance,

use or entrustment to others of any 'auto.' Use includes operation and 'loading and unloading.'

**[2]** The coverage under this policy does not apply to 'bodily injury', 'property damage', 'personal injury', 'advertising injury', or any injury, loss or damage arising out of: . . . Aircraft, aircraft landing strips, runways or any aircraft landing and/or takeoff area, passenger carrying balloons, automobiles, motorized land vehicles of any type, animals or animal rides, trampolines or mechanically operated amusement rides or devices.

The court of appeals rejected the insurer's argument that these exclusions applied because the bodily injury "arose out of the 'non-ownership' of an automobile by an Insured or the 'use' of an automobile by [the automobile driver]." *Id.* at 706.

[The insurer]'s interpretation of the auto exclusions converts those exclusions into unusual and unfair limitations of coverage that defeat the insured's reasonable expectations of coverage. Given that the record provides no evidence that [the insurer]'s broad interpretation of the auto exclusion provisions was brought to the attention of the insureds, we conclude that the auto exclusions do not plainly and clearly preclude coverage of the [] lawsuit in context of the policy as a whole and in the circumstances of the case.

*Id.* at 706–07 (citation omitted).

The Ninth Circuit's opinion, and particularly its discussion of *Essex*, suggests a clear distinction between Penn-Star's exclusion and Zenith's. The Ninth Circuit emphasized that Penn-Star's exclusion applied to *any* auto and *any* person. By contrast, Zenith's exclusion, like the *Essex* exclusions, does not—at least on its face—"specify whether the exclusion pertain[s] broadly to any person or merely to any insured." Zenith's exclusion is not substantively identical to Penn-Star's exclusion but rather more similar to the exclusion in *Essex*, which the Fifth District Court of Appeal refused to apply to a vehicular accident between non-insureds. Zenith's argument that the Ninth Circuit's reasoning applies equally to its exclusion is unpersuasive.

Zenith also argues from the text of its auto coverages exclusion, concluding that the exclusion plainly and clearly applies to the accident underlying the *Garcia* case. To meet its burden of proving that the exclusion applies, Zenith must establish that (1) the liability alleged in *Garcia*

is for "bodily injury" (2) arising out of the use of "any auto" (3) which is not a "covered auto."  If the limitation Zenith argues for does not follow plainly and clearly from the text, then the exclusion cannot be enforced to defeat Camp's reasonable expectation of coverage.

The dispute is whether the Toyota Camry that was driven by Garcia was a "covered auto." The parties agree that the Commercial Umbrella Policy defines "covered auto" as "only those 'autos' to which 'underlying insurance' applies."  (Docket Entry No. 65 at 295; Docket Entry No. 118 at 21).  They also agree that "underlying insurance" means the Zenith policies purchased by Camp, including the Commercial Umbrella Policy, Farm Liability Policy, Commercial General Liability Policy, and Business Auto Policy.  The point of disagreement is whether those Zenith policies applied to the Toyota Camry.

Zenith argues that the policies did not apply to the Camry because:

in order to apply to the Camry an insured must be legally obligated to pay for the injuries due to the use of the Camry.  In other words, for underlying insurance to apply to the Camry, an insured has to be responsible or legally obligated to pay for damages caused by the Camry . . . .  And here that means an insured had to somehow use, unload, operate, loan, do something in connection with the Camry in order to create liability for the insured.  That's what liability insurance is about.

. . .

[B]ecause [the *Garcia* plaintiffs] are not insureds to any underlying insurance, . . . the underlying policies can never apply to the Camry [] because . . . Zenith . . . could [n]ever be legally obligated to pay for anything that a *Garcia* plaintiff did with respect to the Camry.  The insurance doesn't apply to that auto because no insured under any Zenith policy had anything to do with that auto.

Zenith draws an incorrect conclusion from correct premises.  Zenith is correct that the liability insurance provided by the Zenith policies applies when an insured is liable for an auto accident.  (Docket Entry No. 118-3 at 12).  Zenith is also correct—and Penn-Star does not dispute—that the *Garcia* plaintiffs were not "insureds" under the policies.  (*Id.* at 12–13).  But Zenith errs in concluding that, therefore, an "insured" could not be liable for injuries caused by the

Camry. *Garcia* is case in point.  Neither Camp, Golden Labor, nor Mr. Colotl had any connection to the Camry or its occupants.  Yet their insurers paid $2 million to settle the allegations that they were liable for the "bodily injury . . . caused by an accident and resulting from the . . . use" of the Camry.  The *Garcia* defendants' liability was not based on their use of the Camry, but on Mr. Colotl's use of the tractor that collided with the Camry.  Nowhere do the Zenith policies state that liability coverage does not apply unless an insured was using or otherwise had some connection with the auto involved in the accident.  On the contrary, the Commercial Auto Policy provides only that:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

(*Id.* at 12).

The court's rejection of Zenith's argument should not be taken as a conclusion that the Camry was a "covered auto."  The court holds only that Zenith has not met its burden to show that the auto coverages exclusion "plainly and clearly" applies.  *Essex* stands for the proposition that an exclusionary clause applying to auto accidents is not enforceable when the insured was not using, and had no connection with, the auto involved in the accident—at least if the insured had no reason to believe that the clause would apply in those circumstances.  The Ninth Circuit's opinion in this case clarifies that an exclusionary clause applying to the use of any auto "by any person"—like Penn-Star's exclusion—may be enforced in the way that the *Essex* exclusion could not.  Zenith's auto coverages exclusion does not specify whether it applies when the auto has no connection with an insured, nor is that specificity to be found by following the "covered auto" definition into the policies' terms of coverage.

Applying the auto coverages exclusion to the *Garcia* accident would defeat Camp's reasonable expectation of coverage.  The policies provided that "any person is an insured while driving [mobile] equipment [to which this insurance applies] on or next to a public highway with your permission, in connection with your 'farming' operation.  Any other person or organization legally responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the driving or operation of the equipment . . . ."  (Docket Entry No. 65 at 247).  "Mobile equipment" is defined to include "tractors."  (*Id.* at 253, 297).  From this, and without anything plainly and clearly contrary in the policies, Camp could reasonably expect that it would have liability coverage for a highway accident between a tractor driven by its employee and an automobile driven by a stranger.

Because Zenith has not carried its burden, the court need not address Penn-Star's argument that the Camry is a "covered auto."  Nonetheless, the court addresses Penn-Star's interpretation of the exclusion if only because its reasonableness—though it is ultimately unpersuasive to the court—is further proof that Zenith's interpretation does not follow "plainly and clearly" from the text.

According to Penn-Star, Zenith's Commercial Auto Policy is the key to understanding the scope of the term "covered auto," and therefore the scope of the auto coverages exclusion.  The Commercial Auto Declarations state that: "'"Autos"' are shown as covered 'autos' for a particular coverage by the entry of one or more of the symbols from the Covered Autos Section of the Business Auto Coverage Form next to the name of the coverage."  (Docket Entry No. 118-3 at 7).  The symbol next to "liability" coverage in the Declarations is "01," which the Covered Autos Section defines as "Any 'Auto.'"  (*Id.* at 7, 11).  From this, Penn-Star concludes that "covered auto," as used in the auto coverages exclusion, means "any auto."  Penn-Star acknowledges that

this reading "essentially strips out any meaning from the covered autos exclusion" because the category of autos to which the exclusion applies—any auto that is not a "covered auto"—is by definition an empty set.

Penn-Star's argument is clever but unpersuasive, for two reasons.  First, Penn-Star fails to fully grapple with the definition of "covered auto" found within the Commercial Liability Umbrella Policy: "only those 'autos' to which 'underlying insurance' applies."  (Docket Entry No. 65 at 295).  It is only by ignoring this definition that Penn-Star can maintain a distinction between "covered autos" and actual liability coverage.  When asked at oral argument whether Penn-Star's unlimited interpretation of "covered auto" would make the liability coverage correspondingly unlimited, Penn-Star's counsel responded that it would not, because: "[t]he only people who are covered by that policy are the . . . insured people described in that policy who use any auto."  Penn-Star concedes, as it must, that Zenith would have no obligation with respect to liability arising from an accident between two strangers to the policies in vehicles that have no connection to any insureds—in other words, "underlying insurance" would not apply.  But Penn-Star nonetheless maintains that those vehicles would be "covered autos" within the meaning of the auto coverages exclusion.  This position runs contrary to common sense and the definition of "covered auto" in the Commercial Umbrella Policy.

Second, Penn-Star's interpretation fails to give effect to all the terms of the Zenith policies.  In fact, it makes the entire auto coverages exclusion surplusage.  Penn-Star concedes that, under its interpretation of "covered autos," the exclusion would apply in no possible instance.  Penn-Star attempts to cover this interpretational red flag with reference to the idiosyncrasies of insurance policies compared to other contracts, but "[c]ourts must interpret insurance policies, like all

contracts, to try to give effect to every clause and harmonize the various parts with each other." *Friedman Prof. Mgmt. Co., Inc. v. Norcal Mut. Ins. Co.*, 120 Cal. App. 4th 17, 33 (2004).

For these reasons, Penn-Star's interpretation is unpersuasive.  But it is not Penn-Star's burden to persuade the court that the exclusion does not apply.  The burden is Zenith's to prove that the exclusion, by its "plain and clear" terms, does apply.  Penn-Star's reasonable, but ultimately erroneous contrary interpretation, is further evidence that Zenith has not carried its "burden of making coverage exceptions and limitations . . . plain and clear."  *Haynes*, 32 Cal. 4th at 1204.[1]

### 3.      Equitable Principles

Zenith next argues that Penn-Star should be equitably barred from recovering its $1 million settlement contribution from Zenith because Penn-Star "failed to produce a key piece of information that would have supported an affirmance by the Ninth Circuit rather than a reversal." (Docket Entry No. 119 at 8).  Zenith refers to a public document that Penn-Star filed with the California Department of Insurance in 2005 titled "Penn-American Insurance Company – Commercial General Liability and CMP Liability Forms Portfolio." (*Id.*).  Zenith contends that, had Penn-Star produced this document in response to Zenith's requests for production, "it would have been part of the record considered by the Ninth Circuit" and "would have supported an affirmance by the Ninth Circuit rather than a reversal." (*Id.* at 8–9).

Zenith's argument is without merit.  The California Civil Code prescribes that, for a written contract, "the intention of the parties is to be ascertained from the writing alone, if possible."  CAL. CIV. CODE § 1639.  "Extrinsic evidence may be admitted to aid in the interpretation of an insurance

---

[1]   Because the court concludes that Zenith has not met its burden of showing that the auto coverages exclusion applies, it does not address Penn-Star's argument that Zenith has waived its right to invoke the exclusion.  For the same reason, the court denies as moot Penn-Star's motion to strike the declaration of Karen Uno, offered by Zenith to rebut Penn-Star's waiver argument.  (Docket Entry No. 124-1 at 9).

policy only where the terms are ambiguous." *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1291 (2000).

Zenith has not established that it would have been appropriate for the Ninth Circuit to use the unproduced document to guide its interpretation of Penn-Star's auto exclusion. Zenith cannot establish the ambiguity necessary to open the door to extrinsic evidence because the Ninth Circuit determined that "the collision fell within Penn-Star's auto exclusion and was conspicuously, plainly, and clearly outside Penn-Star's coverage." (Docket Entry No. 101 at 4). And even if Zenith could establish that extrinsic evidence was appropriate, Zenith has not established that principles of equity would then support interpreting Zenith's auto coverages exclusion to apply or would bar Penn-Star from recovering its portion of the settlement payment from Zenith.

Penn-Star's motion to strike the declarations of Ron Fukui and David Borovsky, offered in support of Zenith's argument, is granted. (Docket Entry No. 124-1). The declarations are irrelevant to the summary judgment issues.

### 4.      Golden Labor

Zenith next argues that, even if the auto coverages exclusion does not apply, Penn-Star cannot recover its portion of the settlement attributable to Golden Labor's liability because Golden Labor was not an insured and did not have insured status under any Zenith policy. (Docket Entry No. 113 at 15). Zenith relies on the following provision defining who qualifies as an "insured" under each of Zenith's policies:

b. Each of the following is also an insured:

. . .

(5) With respect to "mobile equipment" to which this insurance applies, any person is an insured while driving or operating such equipment on or next to a public highway with your permission. Any other person or organization legally responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the driving or operation of the equipment, and only if no

other insurance of any kind is available to that person or organization for this liability.

(Docket Entry No. 117 at ¶ 28).

Zenith argues that Golden Labor is not covered under this provision because it was not "legally responsible for" Mr. Colotl's operation of Camp's "mobile equipment"—*i.e.*, the tractor. (Docket Entry No. 113 at 16). Zenith further argues that Penn-Star is estopped from arguing otherwise because "Penn-Star submitted extensive evidence and legal authority . . . in opposition to Zenith's prior motion for summary judgment . . . to establish that Golden Labor *was not* vicariously liable for Colotl's conduct." (*Id.*) (emphasis in original). Alternatively, Zenith frames Penn-Star's previous position as "judicial admissions . . . which are binding for purposes of the remainder of this litigation." (*Id.* at 17).

Penn-Star responds that Golden Labor was legally responsible for Mr. Colotl's operation of Camp's tractor. (Docket Entry No. 118 at 9). Penn-Star relies on the "Farm Labor Contractors Service Agreement" between Camp and Golden Labor, which provides that "[a]ll [] laborers shall be hired by Contractor [*i.e.*, Golden Labor] as employees of [Golden Labor] and shall be deemed employees of [Golden Labor] and not Grower [*i.e.*, Camp]." (*Id.*) (quoting Docket Entry No. 107 at ¶ 10). Because the Farm Labor Agreement provided that Mr. Colotl was an employee of Golden Labor and not of Camp, Penn-Star concludes that Golden Labor was vicariously liable for Mr. Colotl's torts committed within the scope of the employment. (Docket Entry No. 118 at 10) (citing *Perez v. Van Groningen & Sons*, 41 Cal. 3d 962, 967 (1986)).

Penn-Star further argues that it is not estopped or barred by judicial admissions from arguing that Golden Labor was responsible for Mr. Colotl's operation of the tractor. Penn-Star contends that its position in opposition to Zenith's prior motion for summary judgment was not that Golden Labor was not vicariously liable for Mr. Colotl's torts, but that "Golden Labor's

'operations'" under the Farm Labor Agreement "were purely administrative," encompassing only the provision of labor and "processing of payroll and benefits." (Docket Entry No. 118 at 13). Penn-Star contends that its prior legal arguments are not judicial admissions, which are "statements of fact as opposed to statements of law or legal argument." (*Id.* at 14) (quoting *Lam Research Corp. v. Schunk Semiconductor*, 65 F. Supp. 3d 863, 870 (N.D. Cal. 2014)). Penn-Star argues that the doctrine of judicial estoppel also does not apply because Penn-Star has not taken two "clearly inconsistent positions" and the court did not accept Penn-Star's prior position. (*Id.* at 14–15) (citing *Nationwide Agribusiness Ins. v. George Perry & Sons, Inc.*, 338 F. Supp. 3d 1063, 1075 (E.D. Cal. 2018) (reciting the elements of judicial estoppel)).

The parties agree that whether Golden Labor had insured status under Zenith's policies depends on whether Golden Labor was vicariously liable for Mr. Colotl's operation of Camp's tractor. (Docket Entry No. 118 at 12). Zenith does not appear to dispute, after the Ninth Circuit's ruling, that Golden Labor had "no other insurance of any kind" covering Mr. Colotl's operation of the tractor.

The court agrees with Zenith that Golden Labor was not vicariously liable for Mr. Colotl's operation of Camp's tractor. However, this conclusion is immaterial to the question of whether Zenith is obligated to reimburse Penn-Star for its portion of the settlement.

"Under the doctrine of *respondeat superior*, an employer may be held vicariously liable for torts committed by an employee within the scope of employment." *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 208, 814 P.2d 1341, 1343 (1991). As Penn-Star notes, the Farm Labor Agreement that governed the relationship among Golden Labor, Mr. Colotl, and Camp provided that Mr. Colotl was an employee of Golden Labor, not of Camp. (Docket Entry No. 107 at ¶ 10). Penn-Star previously argued, in opposition to Zenith's earlier motion for summary judgment, that

Golden Labor had relinquished the right to control Mr. Colotl to Camp, creating a "special employment" relationship between Mr. Colotl and Camp.  (Docket Entry No. 77 at 9–10).  Under California law, a "special employer" may become "solely liable under the doctrine of *respondeat superior* for the employee's job-related torts."  *State ex rel. Dep't. of Calif. Highway Patrol v. Superior Court*, 60 Cal. 4th 1002, 1008, 343 P.3d 415, 417 (2015) (quotation marks and quoting reference omitted).  A "special employment relationship and its consequent imposition of liability upon the special employer flows from the borrower's power to supervise the details of the employee's work." *Marsh v. Tilley Steel Co.*, 26 Cal. 3d 486, 492, 606 P.2d 355 (1980).  However, "not all special employment relationships are exclusive.  Where general and special employers share control of an employee's work, a 'dual employment' arises, and the general employer remains concurrently and simultaneously, jointly and severally liable for the employee's torts." *State ex rel. Dep't. of Calif. Highway Patrol*, 60 Cal. 4th at 1008 (quotation marks and quoting reference omitted).

The question is whether Mr. Colotl had a special employment relationship with Camp that made Camp vicariously liable for Mr. Colotl's job-related torts, to the exclusion of Golden Labor's liability.  The Farm Labor Agreement, in addition to declaring Golden Labor the sole employer, gave Golden Labor significant power to control Mr. Colotl's conduct.  For instance, the Farm Labor Agreement required Golden Labor to "hire, supervise and manage sufficient laborers as determined by [Golden Labor], to conduct planting, suckering, pulling leaves, tipping and harvesting grapes or any other related agricultural operation [Golden Labor] is qualified to perform and which [Camp] retains [Golden Labor] to conduct."  (Docket Entry No. 78 at ¶ 26).  The Farm Labor Agreement provided that "Camp shall have no authority to direct, supervise or control [Golden Labor]'s employees in carrying out any of their responsibilities" and "shall have no right,

directly or indirectly, to direct or control [Golden Labor] in carrying out [its] responsibilities." (*Id.* at ¶ 31).

However, in determining the existence of a special employment relationship, "the terminology used in an agreement is not conclusive." *Kowalski v. Shell Oil Co.*, 23 Cal. 3d 168, 176, 588 P.2d 811 (1979). "The contract cannot affect the true relationship of the parties to it. Nor can it place an employee in a different position from that which he actually held." *Id.* The record evidence shows that, in actuality, Camp controlled all aspects of Mr. Colotl's work except payroll and benefits. Mr. Colotl testified in his deposition that Camp set his hours and work assignments and trained him to operate a tractor. (Docket Entry No. 64 at ¶¶ 8–9). He testified that Golden Labor gave him no training, and that he did not work for Golden Labor, but that Golden Labor "only pay[s]" him. (*Id.* at ¶ 6; Docket Entry No. 78 at ¶ 39).

Penn-Star has produced no evidence raising a genuine factual dispute material to determining whether Golden Labor shared control over Mr. Colotl's work with Camp. All the evidence shows that Camp exercised exclusive control over Mr. Colotl's work. With that exclusive control came exclusive vicarious liability. It follows that Golden Labor was not legally responsible for Mr. Colotl's operation of the tractor, so the Zenith policies did not confer insured status on Golden Labor in connection with the accident. In light of this conclusion, it is unnecessary to decide whether Penn-Star is judicially estopped, or barred by judicial admissions, from arguing that Golden Labor is vicariously liable for the tractor accident.

Penn-Star argues that the special employment doctrine "applies only as a trial defense for a lending employer." (Docket Entry No. 132 at 3). Penn-Star argues that the doctrine does not apply here because "no evidence has been adduced that Golden Labor raised a special-employment defense in the underlying *Garcia* litigation to avoid its otherwise-normal vicarious liability for Mr.

Colotl's operation of D.M. Camp's tractor." (*Id.*).  Penn-Star further argues that, "even if D.M. Camp practically exercised greater influence over Mr. Colotl than the [Farm Labor] [A]greement contemplated, the [A]greement precluded Golden Labor from raising the special-employment defense" because it gave Golden Labor "'all right of control' over Mr. Colotl's activities 'whether exercised or not.'" (*Id.*).

Penn-Star's arguments are unpersuasive.  Penn-Star cites no authority to support its argument that the court should not conduct a special employment analysis to determine Golden Labor's vicarious liability simply because Golden Labor did not raise that defense in *Garcia*. Zenith's policies require the court to determine Golden Labor's vicarious liability for Mr. Colotl's actions.  That analysis necessarily entails a determination of whether Golden Labor relinquished control of Mr. Colotl's work to Camp.  And Penn-Star's second point runs afoul of the principle, well-established in the caselaw, that actual practices trump contractual language in the special employment analysis.  *See Kowalski*, 23 Cal. 3d at 176.

For these reasons, the court is persuaded that Zenith's policies do not provide liability coverage to Golden Labor for the *Garcia* accident.  This conclusion, however, is immaterial to the issue of whether Zenith is required to reimburse Penn-Star for its $1 million settlement contribution.  The $2 million that Zenith and Penn-Star collectively contributed to the *Garcia* settlement is not proportioned to the liability of the separate defendants.  The *Garcia* plaintiffs alleged that Mr. Colotl negligently operated the tractor, and that Golden Labor and Camp were vicariously liable for Mr. Colotl's negligence.  Vicarious liability, by definition, is liability not for one's own actions, but for the actions of another.  *See Chee v. Amanda Goldt Prop. Mgmt.*, 143 Cal. App. 4th 1360, 1375, 50 Cal. Rptr. 3d 40, 52 (2006) ("Vicarious liability means that the act or omission of one person is imputed by operation of law to another, without regard to fault.")

(quotation marks and quoting reference omitted) (alterations adopted).  Thus, both Golden Labor's and Camp's alleged liability was identical to Mr. Colotl's.  Zenith does not dispute that its Policies provided liability coverage to Camp for the *Garcia* accident.  So, the entire settlement payment falls within Zenith's policy coverage, regardless of whether its policies provided coverage to Golden Labor.

Zenith must reimburse Penn-Star for the $1 million that Penn-Star contributed to the *Garcia* settlement.

### B.     Duty to Defend

Under California law, "[a] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity" under the policy.  *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 295, 24 Cal. Rptr. 2d 467, 861 P.2d 1153 (1993).  The duty to defend is broader than the duty to indemnify.  *Id.*  "It extends beyond claims that are actually covered to those that are merely potentially so—but no further."  *Buss v. Superior Court*, 16 Cal. 4th 35, 46, 939 P.2d 766, 773 (1997).

"Determination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy."  *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654, 115 P.3d 460, 466 (2005).  The duty also "exists where extrinsic facts known to the insurer suggest that the claim may be covered."  *Id.*  "[O]nce the insured has established potential liability by reference to the factual allegations of the complaint, the terms of the policy, and any extrinsic evidence upon which the insured intends to rely, the insurer must assume its duty to defend unless and until it can conclusively refute that potential."  *Montrose*, 6 Cal. 4th at 299.

"The defense duty arises upon tender of a potentially covered claim and lasts until the underlying lawsuit is concluded, or until it has been shown that there is no potential for coverage." *Scottsdale*, 36 Cal. 4th at 655. "When the duty, having arisen, is extinguished by a showing that no claim can in fact be covered, it is extinguished only prospectively and not retroactively." *Id.* (quotation marks and quoting reference omitted). "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081, 846 P.2d 792, 796 (1993), *as modified on denial of reh'g* (May 13, 1993).

Zenith accepted the defense of Camp in the *Garcia* action. It rejected the defense of Golden Labor and Mr. Colotl. Penn-Star seeks reimbursement from Zenith of the fees and costs it incurred defending Golden Labor and Mr. Colotl.

### 1.    Golden Labor

Zenith urges the court to apply equitable principles to reduce the fees and costs Zenith owed to Penn-Star in connection with Golden Labor's defense. (Docket Entry No. 113 at 20). Zenith argues that whether it owed a duty to defend Golden Labor turned on a question of law— whether Golden Labor was an "insured" under Zenith's policies. Zenith contends that "a potential for coverage and duty to defend cannot be based upon an unresolved, purely legal question such as the interpretation of a policy provision that is ultimately resolved in favor of the insurer, in contrast to an unresolved factual question." (*Id.*) (citing *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 25–26, 900 P.2d 619, 632 (1995), *as modified on denial of reh'g* (Oct. 26, 1995)).

There is some support in the caselaw for Zenith's assertion that the duty to defend does not arise if a pure question of law creates uncertainty as to whether coverage exists. *See State Farm Gen. Ins. Co. v. Mintarsih*, 175 Cal. App. 4th 274, 284 n.6, 95 Cal. Rptr. 3d 845, 854 (2009) ("There is no 'potential for coverage' and no duty to defend, however, if the existence of coverage

depends solely on the resolution of a legal question (e.g., the interpretation or application of policy terms. . . . In those circumstances, coverage either exists or does not exist.").  However, whether Golden Labor is an "insured" under Zenith's policies is not a pure question of law.  As explained above, that issue turns on two sub-inquiries: (1) whether Golden Labor was legally responsible for Mr. Colotl's operation of the tractor; and (2) whether Golden Labor had other insurance covering liability for Mr. Colotl's operation of the tractor.  Only the second inquiry is a question of law. The Ninth Circuit answered that question in the negative by interpreting the auto exclusion endorsement in the Penn-Star policy.  The first inquiry, by contrast, is a question of fact.  *See Kowalski*, 23 Cal. 3d at 175 ("[T]he existence or nonexistence of the special employment relationship barring the injured employee's action at law is generally a question reserved for the trier of fact.").  That question of fact created a "potential" of coverage at the outset of *Garcia* that could not be resolved until discovery into the facts of Mr. Colotl's work with Camp.  The question became a question of law appropriate for resolution by the court on summary judgment only when the developed record showed that the material facts were "undisputed and no conflicting inferences [we]re possible."  *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 299, 907 P.2d 358, 363 (1995).

The court's determination in this opinion that Golden Labor did not have insured status under Zenith's policies does not retroactively extinguish Zenith's duty to defend Golden Labor. *See Scottsdale*, 36 Cal. 4th at 655.  That duty arose upon the tender of the potentially covered claims in *Garcia*.  A "comparison between the allegations of the [*Garcia*] complaint and the terms of [Zenith's] policy" created the potential for coverage.  *Id.* at 654.  The *Garcia* plaintiffs alleged that Golden Labor was liable for Mr. Colotl's conduct under the doctrine of *respondeat superior*.

(Docket Entry No. 107 at ¶ 8).  Zenith did not "conclusively refute that potential."  *Montrose*, 6 Cal. 4th at 299.

The court is unpersuaded by Zenith's arguments that equitable principles counsel for letting Penn-Star bear a portion of the fees and costs incurred to defend Golden Labor.  The Ninth Circuit's resolution of the legal question—whether Penn-Star's auto exclusion endorsement applies—established "in hindsight that no duty to defend ever existed" as to Penn-Star.  *Mintarsih*, Cal. App. 4th at 284 n.6.  But Zenith's retroactive duty to defend is not compromised legally or equitably by the conclusion that Golden Labor has no vicarious liability for the tractor accident.

Zenith must reimburse Penn-Star for the costs and expenses it incurred defending Golden Labor in *Garcia*.

### 2.    Mr. Colotl

Zenith does not dispute that Mr. Colotl "qualified as an insured under the Farm Liability Policy because he was operating the tractor with Camp's permission."  (Docket Entry No. 113 at 19).  But Zenith argues that, "as a matter of equity, any amount of defense fees and costs incurred for Mr. Colotl should be reduced by a reasonable sum."  (*Id.* at 19–20).  Zenith's argument is based on an alleged "compromise position" that the parties took previously—"an equal sharing in the defense based upon a comparison of policy limits."  (*Id.* at 20).  The court finds no basis in equity for adopting Zenith's compromise.  The Ninth Circuit's opinion established that Penn-Star owes no duty to defend Mr. Colotl.  That extinguished Penn-Star's duty retroactively.  Zenith, by contrast, does not deny that it owed Mr. Colotl a duty to defend.  There would be no equity in making Penn-Star bear fees and expenses that it was Zenith's sole duty to bear.

Zenith is ordered to reimburse Penn-Star for the fees and expenses it incurred defending Mr. Colotl in *Garcia*.

### C.      Prejudgment Interest

Penn-Star seeks prejudgment interest from Zenith on its settlement payment and defense costs and expenses.  (Docket Entry No. 106 at 19–20).  Zenith makes no argument in opposition to the awarding of prejudgment interest.  The court concludes that Penn-Star is entitled to prejudgment interest at a rate of 10% on the fees and expenses incurred to defend Mr. Colotl and Golden Labor, totaling $169,088.98, and on its $1 million settlement payment.  *See U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1139 (9th Cir. 2011); *Westport Ins. Corp. v. California Cas. Mgmt. Co.*, 916 F.3d 769, 781–82 (9th Cir. 2019); Cal. Civ. Code §§ 3287, 3289.

## IV.   Conclusion

Penn-Star's motion for summary judgment is granted.  (Docket Entry No. 106).  Zenith's motion for summary judgment is denied.  (Docket Entry Nos. 111, 113).  Zenith is ordered to pay Penn-Star:

- the fees and expenses Penn-Star incurred defending Mr. Colotl and Golden Labor in *Garcia*, totaling $169,088.98;

- the $1 million Penn-Star paid to settle *Garcia*; and

- prejudgment interest on those amounts.

A final judgment will be issued separately.

SIGNED on April 19, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge